**WALKER et al. v. KELLAR. (No. 6468.)**

(Court of Civil Appeals of Texas. San Antonio. Dec. 16, 1920. Rehearing Denied Jan. 12, 1921.)

**1. Assault and battery ⬦42—Question of participation held for the jury.**

Evidence, in an action for damages by one who was tarred and feathered, *held* to make it a question for the jury whether a defendant, who was present, was a conspirator, or in any way encouraged the assault.

**2. Assault and battery ⬦42—Absence of malice relative to punitive damages, question for jury.**

Freedom from animosity, ill will, and malice, and consequent nonliability for exemplary damages of a defendant claimed to be a party to the conspiracy, pursuant to which plaintiff was tarred and feathered, *held*, under the evidence, a question for the jury.

**3. Assault and battery ⬦18—One present with only good intention not liable.**

One who entered the meeting of those who tarred and feathered plaintiff and followed the procession after the coat was applied, with the sole purpose of preventing bodily harm being done to him, was not liable.

**4. Assault and battery ⬦39—"Malice," as regards exemplary damages, defined.**

Malice, as regards exemplary damages for assault and battery, means a wrongful act, done intentionally or with evil intent, without just cause or excuse, or as the result of ill will.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Malice.]

**5. Assault and battery ⬦43(2, 5)—Instruction, as to computing time for cooling, not clear.**

An instruction as to cooling time, in an action for tarring and feathering plaintiff, in which there was shown, as provocation and in mitigation of damages, a series of unpatriotic acts by plaintiff, during the World War, cul-

minating, on the forenoon of the day of the tarring, in his using abusive language and making an assault on one of a committee waiting on him in the interest of the Red Cross, *held*, even if authorized by any evidence, not to make it clear, as it should, that time for cooling should be computed from the last act of provocation.

**6. Assault and battery ⬦12—Provocation from assault on Red Cross committeeman not limited to him.**

The effect of the assault by, plaintiff on a member of a committee waiting on plaintiff in the interest of the Red Cross as provocation should not be limited to such committeeman in an action for the tarring and feathering of plaintiff by citizens knowing of such assault.

**7. Assault and battery ⬦38—Persons forcing another to leave community and so to sacrifice his property liable for the loss.**

If defendants, who tarred and feathered plaintiff, through their illegal acts compelled plaintiff, because of his unpatriotic conduct, to leave the community, and thereby he was forced to sacrifice his property, they are liable for the difference between its value and what he was compelled to take for it.

**8. Assault and battery ⬦12—Not justified by unpatriotic acts.**

Unpatriotic conduct of one during the war, because of which he was tarred and feathered, cannot justify such act, though it may palliate it and mitigate damages therefrom.

**9. Assault and battery ⬦18—One only present, though mentally acquiescing, not a party.**

One who was merely present, and knew that plaintiff was to be tarred and feathered, not having participated therein nor given aid or encouragement, even if mentally acquiescing, was not liable.

**10. Appeal and error ⬦742(4)—Record not searched for testimony.**

The appellate court will not search the record to ascertain testimony as bearing on peremptory instructions, no mention of which is made in the statement.

**11. Trial ⬦117—Reading court opinions in argument to jury not commended.**

The reading of court opinions during argument to the jury is not to be encouraged or commended.

**12. Trial ⬦117—Reading court opinion in argument condemned as tending to prejudice.**

The reading during argument to the jury, in an action for tarring and feathering plaintiff because of his unpatriotic conduct, of portions of a court opinion criticising a prosecution under a sedition statute, condemned as tending only to engender prejudice in the jury.

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Action by W. E. Kellar against G. C. Walker and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

E. B. Coopwood, of Lockhart, T. J. Newton, of San Antonio, W. O. Slater, of Luling, and

Templeton, Brooks, Napier & Brown, of San Antonio, for appellants.

John Sehorn, of San Antonio, for appellee.

FLY, C. J. This is a second appeal of this case, the opinion on the first appeal being published in 218 S. W. 792–802. We adopt the statement of the nature of the cause of action made on that appeal. As on the first trial, a peremptory instruction was given to find for appellee, and the amount of recovery was fixed by the jury at $7,000 actual and $4,000 exemplary damages.

[1] Through the first assignment of error appellants, consisting of G. C. Walker, W. P. Walker, C. T. Greenwood, W. B. Walker, R. Jacobs, T. T. Brown, S. H. Boggus, J. F. Boggus, J. J. Davis, R. B. Neill, J. W. Allen, and Wansley Wiley, assail the peremptory instruction in so far as it affects W. P. Walker, because there was evidence tending to show that said W. P. Walker took no part in the unlawful acts of appellants in tarring and feathering and parading appellee through the streets of Luling, and, on the other hand, showed that the said Walker was at his farm outside of Luling, and was sent for to come to the place of the assembly of the enraged citizens of Luling, to protect appellee against any violence on the part of such assembly, and that his sole purpose and desire on that occasion was to extend protection to appellee, and that he did protect appellee from personal harm and violence so far as he was able. There was evidence tending to establish these contentions, as a brief review of the testimony offered by appellants will show.

T. T. Brown testified that he was captain of the Home Guards and a member of the Council of Defense; that it was the duty of the captain to "look out for anything that pertained to the war, against the war, or slackers, or deserters, or anything against our war work in general; it was to aid in the prosecution of the war, to keep down dissension, and those things;" that on May 17, 1918, he had been on his farm, and when he returned to Luling he found the population gathered in different groups, much excited over a difficulty that had occurred between appellee and R. Jacobs and W. B. Walker, and they demanded that action be taken as to appellee, and talked of hanging or killing him in some other way. Brown stated that, seeing the crowd so excited, he felt that he needed some one to help him "hold that crowd down" and keep appellee from being killed, and he felt that W. P. Walker was the man to assist him. He sent for W. P. Walker, who was at his farm, and while awaiting his arrival he summoned some of the men to go to a certain clubroom. Brown ordered the tar and feathers, without the knowledge of W. P. Walker. The men, some 30 or 35 of them, met in the clubroom. Brown made known the object of the meeting, and called on Jacobs for a statement of what had happened that day, and

Brown then appointed a committee to apply the tar and feathers. After that W. P. Walker arrived, and was appointed by Brown to preside over the meeting, as he was a cool-headed, determined man. Brown asked W. P. Walker to preside, and told him what he wanted told appellee when he brought him to the clubroom. After the message was delivered, Brown ordered his committee to proceed to tar and feather appellee. W. P. Walker prevented them from putting any tar on appellee's flesh.

W. P. Walker testified that he lived in San Antonio, and had been in Robertson county on his farm for two months; that the night before the tarring and feathering took place he had arrived in Luling, and had gone to his farm near that place. He swore that he knew nothing of any trouble with Kellar, and did not hear about it until in response to a message from Brown, he went to the clubroom. He stated:

"Up to the time that I got there I didn't know anything in the world about it; it was all just like thunder out of a clear sky to me, because I had never heard anything of it. I didn't have anything to do with the appointment of the committee. I was not there when it was appointed."

He testified that he gave no orders or directions in regard to the matter to any one, but said that his only intention or desire was to protect appellee from bodily harm, and that was his only reason for being present in obedience to the request of T. T. Brown. He did not touch appellee or apply any of the tar or feathers to him. He swore that his passions were not aroused in the least, but that he felt nervous over the crowd that had assembled. He disclaimed all knowledge that tar and feathers were to be applied until the application began, and had no unfriendly feeling towards appellee. His sole desire was to prevent bodily injury to appellee.

These facts raised an issue as to whether W. P. Walker was present at the time of the alleged assault as one desirous to protect the person of appellee, and whether he had entered any conspiracy to tar and feather him. The question of the intent of W. P. Walker in being present was not a matter of law to be determined by the court, but was a question of fact to be determined by the jury.

If appellant was a party to the conspiracy, if there was one, to injure appellee, it was not as an original participant, because all of the testimony clearly proved that he knew nothing about the matter until it was under full headway, and would have known nothing about it had he not been summoned by Brown to assist in protecting appellee from bodily injury. W. P. Walker undoubtedly entered the meeting for a lawful purpose, and, if any guilt or liability attached to him, it must have been on account of unlawful acts committed by him after entering the meeting. He must have learned that tar and feathers were to be

applied to appellee, and must have given aid, by word or act, to a furtherance of the common design. 5 R. C. L. § 43. On the former appeal this court found that W. P. Walker knew that tar and feathers were to be applied before he delivered Brown's message to appellee, but on this trial it was shown without contradiction that W. P. Walker, when he delivered the message of Brown to appellee, did not know that tar and feathers were to be applied. W. P. Walker swore:

"No, sir; I wasn't there for the purpose of seeing what the committee had done was carried out, and I did not so state to Kellar. I told Kellar what Mr. Brown had told me. I didn't know at that time they were going to tar and feather him. Mr. Brown didn't tell me that they were going to tar and feather him."

If, as the testimony tends to show, W. P. Walker was present to prevent death or bodily hurt to appellee, and felt that object would be better attained by not protesting or resisting the milder attack of a coat of tar and feathers on his clothing, of which he knew nothing until it was being administered, the facts raised a question as to his culpable participation in the attack on appellee, and that question was one for the determination of a jury. According to the evidence offered by appellants, W. P. Walker, being present, not knowing the unlawful intention of the assembly, did not aid by acts, or encourage by words or gesture, those actually engaged in the commission of the unlawful act, and used no means of any kind to assist in the commission of the offense, and did not advise or agree to the commission of the offense. The question of his guilty participation in the offense was raised by the evidence, and, whether the court believed that evidence or not, it was a matter to be decided by the jury, and not by the court. W. P. Walker must be judged by his own intention, and, if that was not criminal or unlawful, he should be exonerated, and should, at least, be permitted to have a jury pass upon his acts and conduct as evidencing his intention.

[2] As to W. P. Walker, there were facts tending to show that he had no animosity, ill will, or malice towards appellee. He knew nothing of the unpatriotic acts charged against appellee; he knew nothing of the excited and inflamed feelings of the citizens of Luling; he was brought to the scene of the affair by the orders of a captain of the Home Guards, acting under the laws of the American government in a time of war, when the fires of patriotism were burning fiercely in the hearts of men whose sons had crossed the Atlantic ocean to battle against the trained hosts of the imperial, autocratic governments of Germany and Austria. He recognized the orders of Brown to report in Luling as the orders of an officer of his government, and he answered the summons, and did nothing, ac-

cording to the testimony of appellant, except to deliver a message of T. T. Brown to appellee. He delivered that message, and did nothing more, if the evidence of appellants is true. W. P. Walker had the right to a finding on the question of exemplary damages disconnected from the acts of his codefendants. As said in Railway v. Thompson, 102 Tex. 89, 113 S. W. 144, 19 Ann. Cas. 1250:

"If the defendants, or either of them, were actuated by malice in making the charges against Thompson, or in procuring the same to be made and prosecuting the same before the order, thereby procuring his expulsion, then the plaintiff may, in the discretion of the jury, recover exemplary damages against either or all of the said defendants, in such sum as the jury may believe should be assessed against the said defendants or either of them. It is not necessary, as in case of actual damages recovered, that all of the defendants should be subjected to the same verdict, because some of the defendants may have acted without malice, but in combination with others, and as to such defendants there would be no right to recover exemplary damages."

Testimony tending to show there was no malice or wanton acts upon the part of W. P. Walker, the question of exemplary damages as to him should have gone to the jury. The second and third assignments are therefore sustained.

[3] It was a question of fact, to be considered by a jury, as to the acts of W. P. Walker, as bearing upon both actual and exemplary damages; and appellants sought to obtain a presentation of his defenses to the jury through a special charge, but it was refused. If, as sought to be presented in special charge No. 2, requested by W. P. Walker, his sole purpose in entering and remaining in the meeting and going with the procession was to prevent bodily harm being done to appellee, the jury should have returned a verdict in his favor. The fourth assignment of error is sustained.

[4] Malice means a wrongful act, done intentionally, or with evil intent, without just cause or excuse, or as the result of ill will. Express Pub. Co. v. Wilkins, 218 S. W. 614. Under that definition, as well as under the ruling of this court on the former appeal, we hold that the evidence justified the submission of the question of exemplary damages to the jury. The fifth, sixth, and seventh assignments are overruled.

[5] On the former appeal of this cause it was held that acts and language of appellee tending to show his antagonistic and unpatriotic attitude towards the American government, and at least one of its great agencies, in the prosecution of the war against the attack of the autocracies of Central Europe upon the civilization and democracy of the world should be admitted, and such evidence was permitted on this trial. The reason for the admission of such evidence was to show that it aroused the passions of

reasonable men, and the detestation and condemnation of those whose sons were battling for right and liberty in Europe, and would tend to mitigate their acts towards appellee, upon whom they looked as a traitor to the American flag. These different acts of contumacy and provocation formed a continuous unbroken link culminating in the act wherein appellee used abusive language and made an assault upon one of a committee waiting on him in the interest of the Red Cross organization, which had become an indispensable agency of the government. That occurred in the forenoon, and appellee received the coat of tar and feathers on the afternoon of May 17, 1918. Such being the state of facts, the court instructed the jury, in the seventh paragraph of his charge, correctly as to the full force and effect of evidence of the different acts of provocation which culminated on May 17, 1918, when the last act was committed but in the eighth paragraph the jury was told—

"that no such provocation, if any, arising out of such conduct, if any, of plaintiff, continuous and culminating on May 17, 1918, can be considered by you in mitigation of damages if thereafter sufficient cooling time has intervened."

While this charge, standing alone, might not form a sufficient basis for a reversal, it may be said, in view of another trial, that a jury might infer from the language of the charge that the question of "cooling time" referred to all or any one of the acts of provocation. Under the facts we fail to see any applicability in the charge, for there was nothing to indicate that time for reflection and cool action had intervened between the last provocation and the acts committed by appellants, so as to raise an issue in connection therewith. If, however, the facts demanded such a charge, it should have been made clearly to appear that time for cooling should be computed from the last act of provocation. The charge might have been construed by the jury as meaning that time had destroyed the effect of former provocations on the minds of appellants.

[6] The fact of the assault on W. B. Walker by appellee was made known by Walker to the citizens of Luling, and that assault formed one essential and larger part of the culminating act of provocation by appellee. That provocation extended not only to W. B. Walker, but to the other appellants, and the court should not have confined its effects and results to W. B. Walker alone, as he did. The tenth assignment of error is sustained.

[7] It is alleged in the petition that appellee owned a stock of goods of the value of $3,500, a house in which he conducted his business, and a home, all of which appellants forced him to leave; that his business was left in the hands of his employés, and that he lost profits and was compelled to dispose of the goods at a loss of $2,600, to sell his place of business at a loss of $1,000, and his home at a loss of $300. If through the illegal acts of appellants appellee was compelled to sacrifice his property, real and personal, appellants should be held liable for the difference between the real value of the property and the price he was compelled to take for it. It can readily be understood that if a man is compelled to leave a community, those who might buy will take advantage of his necessities and the exigencies of the circumstances and offer less than the real value of the property. If these circumstances were produced through the culpable and illegal acts of appellants, they should be compelled to pay for it. The eleventh, twelfth, and thirteenth assignments of error are overruled.

[8] We can, as American citizens, appreciate the motives and sentiments of patriots during the great World War, when every resource of this wealthy and mighty republic was being marshaled for the death struggle with the trained and disciplined legions of the central European autocracies; we can, as individuals, sympathize with the indignation that was aroused in every loyal heart by words and acts on the part of any one enjoying the blessings of our free institutions, indicating lukewarmness and indifference, if not disloyalty, to the flag; but when such noble sentiments of patriotism, such just indignation, incite to lawlessness and disturbance, courts must condemn such outbreaks, if we are not to destroy law and order, enthrone the lawbreaker, and inaugurate the terrible reign of the mob. The high and patriotic motives which no doubt actuated appellants in condemning one not in sympathy with the government in its death struggle with the Germanic Empire, one whom they deemed to be a traitor and incited them to deal out punishment to him, may be placed in evidence in mitigation of their acts; but the fact remains that they were without the pale of the law, and they must meet with condemnation at the hands of judicial tribunals. If republics are to survive, and give that liberty and protection hoped for from them, love and veneration for law and order must be cultivated in the minds and instilled in the hearts of the people; courts must be sustained, and infractions of law justly and rightly punished through legalized machinery. Whenever the legalized methods of enforcing law are disregarded, whenever self-constituted assemblies of men usurp the power and authority of constitutional agencies, and assume the power of depriving men of the rights of property, life or limb, it is an attack upon our principles and free institutions, more insidious and dangerous than any other influence or crime. Whenever the legalized methods of procedure enjoined by statute for the upholding of right and redress of wrong, for the punishment of crime and protection of society, are set aside by any man or set of men, and execution of the law is usurped by them, the law is brought into

disrepute, and the bonds of righteous government loosened and eventually destroyed. We deemed it appropriate to advance these thoughts in view of the argument of appellants that, under the aggravating circumstances, they were justified in taking the law into their hands. Those circumstances may palliate and mollify their acts, and mitigate and lessen any damages arising therefrom, but cannot justify. The fourteenth assignment is overruled.

Complaints of excess in the verdict need not be discussed in view of another trial, and the fifteenth assignment of error is for that reason not considered by the court. The sixteenth assignment has been disposed of by our action on the first, second, and third assignments.

[9, 10] The seventeenth assignment claims error in the peremptory instruction as to G. C. Walker, W. P. Walker, and R. Jacobs, because the testimony raised an issue as to their participation in the assault on appellee. The statement clearly tends to show that W. P. Walker was merely present in the clubroom, knowing what was intended, but did not aid by acts, or encourage by words or gestures, those actually engaged in the commission of the unlawful act, nor keep watch for the others. Mere presence and knowledge of the unlawful assault upon appellee did not make W. P. Walker a principal or render him liable for damages. He must have given aid or encouragement of some kind to the actual participants. No mention is made in the statement of the testimony as to G. C. Walker and R. Jacobs, and this court will not search the record to ascertain the testimony as to them. As to W. P. Walker the court should not have given a peremptory instruction, but should have submitted to the jury the question as to whether he participated in the assault on appellee. Mere presence and mental acquiescence would not necessarily render every one in the clubroom guilty of participating in the illegal act; and where the evidence raised any issue of guilty participation or not upon the part of any person present, that issue should have been presented to the jury for their decision. The rule as to participation in the assault is well stated in the Kentucky damage suit of Ryan v. Quinn, 71 S. W. 872, wherein it was said:

"If Ryan incited, procured, or encouraged the other men to beat Quinn, he is responsible; but he is not responsible because in his heart he may have approved it. * * * He is only responsible when he incites or procures it, or aids in its commission."

See, also, 2 Ruling Case Law, p. 526, § 4, and authorities cited.

Numerous cases by the Court of Criminal Appeals of this state are to the same effect. That court has construed article 78 (Pen. Code) Crim. Stats., which provides that "any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act," not to mean that mere presence and secret acquiescence would constitute a party a guilty participant in the offense. We do not hold that W. P. Walker is not liable, but do hold that an issue as to his liability is raised by the evidence, and should be determined by a jury, and not by a court.

[11, 12] The reading of decisions of federal or state courts during argument to a jury is not to be encouraged or commended, and the inflammatory dissertation of the United States District Court of Montana (Ex parte Starr, 263 Fed. 145), on the subject of patriotism, real and pseudo, could have no other tendency than to engender prejudice in the minds of the jury. The opinion was denouncing fanaticism like that which "incited the massacre of St. Bartholomew, the tortures of the Inquisition, the fires of Smithfield, the scaffolds of Salem," and then applied the denunciation to a certain kind of patriotism. The court, speaking of religion and patriotism, said:

"In its name, as in that of Liberty, what crimes have been committed! In every age it, too, furnishes its heresy hunters and its witch burners, and it, too, is a favorite mask for hypocrisy, assuming a virtue which it haveth not. So the mobs mentioned were generally the chosen and last resort of the slacker, military and civil, the profiteer, and the enemy sympathizer, masquerading as superpatriots to divert attention from their real character."

There was no testimony tending to show that either of the appellants was a slacker, a profiteer, or an enemy sympathizer, and yet counsel told the jury:

"How well does that definition fit the defendants in this case! These men, superpatriots; these men who want to force somebody else to square with their opinion of how to act."

Other and equally objectionable portions of the passionate opinion were read by counsel. The court should not have permitted the reading of the opinion. It could have produced no good result, it may have caused harm. Railway Co. v. Wesch, 85 Tex. 593, 22 S. W. 957; San Antonio Traction Co. v. Lambkin, 99 S. W. 574.

The record fails to indicate any fraud upon the part of appellee in making G. C. Walker and W. P. Walker, residents of Bexar county, parties in order to give the district court of that county jurisdiction, and the nineteenth, twentieth, twenty-first, and twenty-second assignments of error are overruled.

The twenty-third and twenty-fourth assignments of error are overruled, and the twenty-fifth and twenty sixth assignments, which complain of excess in the verdict, need not be considered, in view of another trial.

The judgment is reversed and the cause remanded.