Joe JAMES and Judy James, Individually and as Co–Administrators of the Estate of Jessica Jeanette James, Thomas Wayne Steger and Sabrina Collins Steger, Individually and as Co–Administrators of the Estate of Kayce Steger and Chuck Hadley, Individually, and Gwen Hadley, Individually and as Administratrix of the Estate of Nicole Marie Hadley, Appellants,

v.

Larry WILSON, Randy Wright, Glenda Collins, Connie Smith, Bill Bond, Barbara W. McGinty, Tobe Dulworth, Jana Mansfield, Georgia Tomlin, Alan Warford, Brandon Newberry, Tilford L. Underwood, Barbara Vick, Charles Courtney, Alan Mullins, Shirley Turner, Bob Steele, Roger Hayes and Donna Mattingly (No. 1999–CA–000787–MR), Trent Matthis, Sam McReynolds, Alan Coleman, Ryan Cornille and Jay Massie (No. 1999–CA–001209–MR), Amy White, Cathy Evanko and Pam Wrinkle (No. 1999–CA–002172–MR), Wendall Nace (No. 2000–CA–001379–MR), Sara Culp, Amanda Jones, Ben Strong, Becky

Flynn and Robert Teer (No. 2000–CA–001382–MR and No. 2000–CA–001491–MR), Matthew Barnett, Michael Alonso, James O'Nan and Toby Nace (No. 2000–CA–001687–MR), Jeremy Ellis (No. 2000–CA–001688–MR), Mike Zink (No. 2000–CA–001690–MR), and John Carneal and Ann Carneal (No. 2000–CA–001862–MR), Appellees.

Nos. 1999–CA–000787–MR, 1999–CA–001209–MR, 1999–CA–002172–MR, 2000–CA–001379–MR, 2000–CA–001382–MR, 2000–CA–001491–MR, 2000–CA–001687–MR, 2000–CA–001688–MR, 2000–CA–001690–MR, 2000–CA–001862–MR.

Court of Appeals of Kentucky.

April 19, 2002.

Discretionary Review Denied Feb. 12, 2003.

Mike Breen, Bowling Green, KY, for appellants.

Michael D. Moore, Richard C. Roberts (on brief), Whitlow, Roberts, Houston & Straub, Paducah, KY, for appellees John and Ann Carneal.

Robert L. Prince, Prince & Brien, P.S.C., Benton, KY, for appellee Wendall Nace.

Richard E. Peyton (on brief), Frymire, Evans, Peyton, Teague & Cartwright, Madisonville, KY, for appellee Sam McReynolds.

Daniel S. Stratemeyer (on brief), Paducah, KY, for appellee Ryan Cornille.

Max S. Hartz (brief only), McCarroll, Nunley & Hartz Owensboro, KY, for appellees Jay Massie and Robert Teer.

Stephen D. Gray (on brief), J. Christopher Hopgood, Dorsey, King, Gray & Norment, Henderson, KY, for appellee Trent Matthis.

Robert V. Bowers, Jr. (on brief), Richard L. Walls, Bennett, Bowman, Triplett & Vittitow, Owensboro, KY, for appellee Alan Coleman.

Reford H. Coleman (on brief), Matthew C. Hess (on brief), Coleman, Lochmiller & Hall, Elizabethtown, KY, for appellee Becky Flynn.

Timothy D. Mefford (on brief), Franklin, KY, for appellee Matthew Barnett.

Timothy L. Edelen, Paul T. Lawless (on brief), Bell, Orr, Ayers & Moore, P.S.C., Bowling Green, KY, for appellee Jeremy Ellis.

Richard L. Walter (on brief), Boehl, Stopher & Graves, LLP, Paducah, KY, for appellee Michael Alonso.

Stephen M. Arnett (on brief), Hulett & Arnett, Morganfield, KY, for appellee Toby Nace.

C.A. Woodall, III (on brief), Woodall & Quinn, PLLC, Cadiz, KY, for appellee Mike Zink.

Wm. Kevin Shannon (on brief), Bryant & Kautz, PSC, Paducah, KY, for appellee James O'Nan.

Whitni J. Cayce (on brief), Richard L. Walter, Boehl Stopher & Graves, LLP, Paducah, KY, for appellee Sara Culp.

Serieta G. Jaggers (on brief), Jackson & Jaggers, Paducah, KY, for appellee Ben Strong.

No brief filed for appellee Amanda Jones.

Michael A. Owsley, Regina A. Jackson (on brief), English, Lucas, Priest & Owsley, Bowling Green, KY, for appellees Larry Wilson, Randy Wright, Glenda Collins, Connie Smith, Bill Bond, Barbara W. McGinty, Tobe Dulworth, Jana Mansfield, Georgia Tomlin, Alan Warford, Brandon Newberry, Tilford L. Underwood, Barbara Vick, Charles Courtney, Alan Mullins, Shirley Turner, Bob Steele, Roger Hayes, Donna Mattingly, Amy White, Cathy Evanko and Pam Wrinkle.

Before GUIDUGLI, HUDDLESTON and JOHNSON, Judges.

*OPINION*

HUDDLESTON, Judge.

It would be difficult to overstate the horrific nature of the events which gave rise to the case now before the Court, or the grievous effects they have had on the individuals and the community involved.

On December 1, 1997, Michael Carneal, then fourteen years of age, entered Heath High School in McCracken County, Kentucky, with a number of weapons. After inserting earplugs, he removed a .22 caliber pistol from his backpack and opened fire into a prayer group, killing three students and injuring five more.[1] In the wake of that tragedy, appellants, the parents of the three students who were killed, sought to impose civil liability on some fifty-three defendants, not all of whom are presently before this Court.[2]

While the specific details and procedural history of this case are complicated and convoluted, the various legal theories advanced can be greatly simplified and grouped into meaningful categories. Specifically, the issues presented are:

● Should the venue of this action have been transferred outside McCracken County?

● Should the circuit judge have recused himself in light of comments he made to the media?

● Does a genuine issue of material fact exist as to the alleged negligence of the owner of the .22 caliber pistol used in the shooting?

● Does a genuine issue of material fact exist as to the alleged negligence of the parents of Michael Carneal?

---

1. Obviously, this is far from a complete statement of all the relevant facts in this case. More attention will be given to factual background as various issues are discussed in detail in the remainder of this opinion.

2. Michael Carneal, amongst others, was named as a defendant in the circuit court actions, but is not a party to these appeals.

• Did those students who allegedly had seen Michael Carneal previously bring a gun to school or who had some indication of his planned attack have a duty to warn others so as to give rise to a legally cognizable claim entitling appellants to relief?

• Does a genuine issue of material fact exist as to whether certain students negligently encouraged Michael Carneal to commit these horrific acts or conspired with Carneal to take over Heath High School?

• Finally, are those teachers and/or school personnel named as defendants-appellees in this case immune from a suit for damages?

For reasons to be explained below, we conclude that appellants have neither stated legally cognizable claims upon which relief may be granted nor presented a genuine issue of material fact regarding those claims for which relief could potentially have been granted. With that introduction, we address each legal issue in turn.

### *Standards of Review*

All the legal questions before the Court for review in this case arise in the context of summary judgment[3] or dismissal for failure to state a claim upon which relief can be granted.[4] Consequently, we shall outline separately those standards of review.

Summary judgment is only proper "where the movant shows that the adverse party could not prevail under any circumstances."[5] However, "a party opposing a properly supported summary judgment motion cannot defeat that motion without presenting at least some affirmative evidence demonstrating that there is a genuine issue of material fact requiring trial."[6] The circuit court must view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor."[7] "The trial judge must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists."[8]

This Court has said that the standard of review on appeal of a summary judgment is

whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law.... There is no requirement that the appellate court defer to the trial court since factual findings are not at issue.[9]

In the context of a motion to dismiss for failure to state a claim upon which relief can be granted,[10] the analysis is somewhat different. "The court should not grant the motion unless it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim."[11] In mak-

---

3. *See* Ky. R. Civ. Prov. (CR) 56.

4. *See* CR 12.03.

5. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476, 480 (1991), *reaffirming Paintsville Hospital v. Rose*, Ky., 683 S.W.2d 255 (1985).

6. *Hubble v. Johnson*, Ky., 841 S.W.2d 169, 171 (1992).

7. *Steelvest, supra*, n. 5.

8. *Id.*

9. *Scifres v. Kraft*, Ky.App., 916 S.W.2d 779, 781 (1996).

10. *See* CR 12.03.

11. *Pari–Mutuel Clerks' Union v. Kentucky Jockey Club*, Ky., 551 S.W.2d 801, 803 (1977).

ing this decision, the circuit court is not required to make any factual determination; rather, the question is purely a matter of law. Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief?

### The Issue of Venue is not Ripe for Review

A sizeable portion of each of the several briefs filed by appellants in these appeals is devoted to the issue of whether these cases should be tried in McCracken County or moved elsewhere. The appellants contend that these cases and the related criminal case generated so much media attention that it would be impossible to impanel an impartial jury in McCracken County or, for that matter, in any county in Western Kentucky.

The circuit court neither granted nor denied the appellants' motion for a change of venue. Rather, the court deferred ruling on the motion until the day of trial in order to first determine whether it would be possible to seat an impartial jury in McCracken County. In the event that an impartial venire could not be had, the court indicated that it would grant the motion for change of venue.

■■■ It is, therefore, readily apparent that the circuit court's decision on the venue issue did not amount to a final order under Kentucky Rules of Civil Procedure (CR) 54.01, and thus is not one from which an appeal may be taken. Consequently, the question of whether the place of trial should have been transferred to some venue other than McCracken County is not properly before us for review.[12]

### The Refusal of the Circuit Judge to Recuse is a Moot Point

Equally pervading the appellants' briefs is the contention that the special circuit judge, the Honorable William L. Shadoan, should have stepped aside because he could not impartially try these cases.[13] At the heart of this allegation are several statements made by Judge Shadoan to the media, particularly the *Paducah Sun* newspaper. Appellants argue that statements made by Judge Shadoan evinced a lack of impartiality on his part and a failure to abide by the Kentucky Code of Judicial Conduct.[14]

· ■■■ Ultimately, however, there is no need for this Court to address the substance of appellants' allegations. As explained above, this appeal involves a *de novo* review by this Court of questions of law. Because there are no discretionary decisions at issue, we grant no deference to the circuit court's rulings. Therefore, any action by the circuit judge which allegedly may have been improper is irrelevant.

Additionally, it should be noted that because we are affirming every dismissal granted by the circuit court, there is no concern about the possibility of further proceedings at the circuit court level. Therefore, there is no way in which appellants could be or could have been prejudiced by the conduct of the circuit judge. While some question may be said to exist

12. Because this case has been decided purely upon issues of law not involving factual issues, the question of whether an impartial jury may be seated in McCracken County is moot. *See* recusal discussion, *infra.*

13. The appellants twice brought this matter to the attention of Chief Justice Joseph Lambert, who twice declined to remove Judge Sha-

doan. While the Chief Justice's refusal to remove Judge Shadoan is not binding upon this Court in this instance, his decision is, of course, granted great deference. *See Foster v. Overstreet*, Ky., 905 S.W.2d 504 (1995).

14. Sup.Ct. R. (SCR) 4.300.

regarding the propriety of the judge's comments to the media, legally the issue is moot.

### No Genuine Issue of Material Fact Exists as to Wendall Nace's Negligence

■ Wendall Nace is the owner of the .22 caliber pistol used by Michael Carneal in the shootings at Heath High School. Appellants argue that Nace was negligent in the way he stored the pistol and that his negligence contributed to the death of appellants' decedents. As will be explained below, we reject this argument and conclude that summary judgment was properly granted for Nace.

Appellants rely on the case of *Spivey v. Sheeler*[15] in support of their position that Nace is liable for the deaths resulting from the shootings at Heath High School. However, that case is factually distinguishable from the matter at hand.[16]

In *Spivey*, a twelve-year-old victim was accidentally shot by an eleven-year-old who had gained access to his parents' pistol. Kentucky's highest court found evidence sufficient to require a jury determination as to whether or not the parents were negligent in the manner in which they stored the pistol. However, the evidence in *Spivey* is quite different from that regarding Nace. In *Spivey*, the gun was left loaded in a glass-front storage case. The Court went to great lengths to emphasize that in its loaded condition, the gun was in a dangerous condition. Additionally, because the gun was in a glass-front case which could be easily opened, it was foreseeable that children would be drawn to it.

In this case, the pistol used in the shootings was not stored in a loaded condition, nor was it readily accessible. Rather, the gun was kept unloaded in a hard plastic storage case in a cabinet behind several other items. Carneal stole the pistol and, later, surreptitiously broke into the outbuilding where Nace kept his ammunition. It was only after Carneal had loaded the stolen ammunition into the stolen pistol that it became a dangerous weapon.

■ While it might be foreseeable that a minor would be drawn to a visible gun and negligently shoot someone with an already-loaded weapon, "[t]here is a vast difference in danger and foreseeability of danger between an unloaded and a loaded gun . . . ."[17] The law does not view as foreseeable the intentional criminal acts of a third party when considering the position of the gun owner from whom the weapon is stolen.[18]

More closely resembling the present case is *Dick v. Higgason*.[19] In *Dick*, the owner of an auto parts and salvage business kept an unloaded rifle in his private office. The ammunition for the rifle was kept in the rear of a desk drawer in the office. The son of one of the owner's

---

15. Ky., 514 S.W.2d 667 (1974).

16. There is also some discussion in appellants' brief regarding *Restatement (Second) of Torts* § 316 (1999); specifically, whether it has been adopted as the law of the Commonwealth. *Spivey* does rely on the aforementioned *Restatement* section, but the Court did not expressly adopt it as the law of Kentucky. However, it is unnecessary for this Court to address this question because *Spivey* is not applicable to the issue at hand.

17. *Spivey, supra*, n. 15, at 672. The acts of Michael Carneal have not been viewed by the Commonwealth as those of a minor too young to know better or to behave safely; instead, the Commonwealth proceeded with criminal charges against him as an adult.

18. *See Gilliam v. K–Mart, Inc.*, 594 So.2d 1021 (La.App.1992).

19. Ky., 322 S.W.2d 92 (1959).

employees entered the office and removed the gun and ammunition. After loading the weapon, the boy began target shooting in a lot outside the building. Unfortunately, the boy accidentally shot a person in an adjoining lot.

Kentucky's highest court held that by removing the cartridges from the rifle and storing it in his private office, the gun owner was under no duty "to anticipate that someone would go into his desk by stealth, ransack it in order to abstract the cartridges therefrom and thereafter take one of the weapons and in its use accidentally shoot a bullet into the body of a man working near by." [20] Likewise, Nace was under no duty to anticipate that Michael Carneal would ransack his shed,[21] steal his gun and ammunition, and use them in the intentional shootings of other students.

 Finally, it should be noted that even though the *Spivey* court went to great lengths to distinguish that case from *Dick* by pointing to the increased dangerousness of the gun created by virtue of its being loaded, it is not the law of the Commonwealth that a loaded gun is an inherently dangerous instrumentality. Indeed, it was held in *Green v. Roe*,[22] decided after *Spivey*, that a loaded shotgun was not an inherently dangerous instrumentality, and that keeping it against the wall behind a bedroom door was not negligence *per se* on the part of the owner. Surely, then, Nace was not negligent for having kept an unloaded pistol in a plastic case in a cabinet behind other items, especially in light of the fact that separate acts of burglary and theft were required to complete the shootings.

No material evidence has been elicited to show that Wendall Nace's storage of his pistol was somehow negligent and/or contributed to the deaths of appellants' decedents. Appellants have failed to adduce any evidence that would bring this case in line with *Spivey* and that give rise to a jury question as to any negligence on Nace's part. As a matter of law, Nace cannot be said to have been negligent in his storage of his pistol and ammunition.

### No Genuine Issue of Material Fact Exists Regarding the Alleged Negligence of John and Ann Carneal

 Appellants argue that Michael Carneal's parents, John and Ann Carneal, should be held liable for their own negligence in failing to control their son, Michael. While this type of parental negligence can give rise to a viable cause of action, appellants have failed to develop any facts that raise a jury question. Therefore, summary judgment was properly granted to the Carneals.

Both appellants and the Carneals have cited a number of decisions from other jurisdictions which have held in various instances that parents were or were not liable for negligently failing to control their children. Such a wide-reaching analysis is not necessary, however, because the Kentucky case of *Moore v. Lexington Transit Corporation*[23] is dispositive.

In *Moore*, a jury question was found to exist regarding a mother's negligence in not preventing her eight-year-old child from opening a car door into an oncoming bus. Crucial to this finding, however, were the facts that the child had done so on prior occasions, and that in this in-

---

20. *Id.* at 94–95.

21. It is unclear exactly what sort of building is in issue; it is referred to in the record only as an "outbuilding."

22. Ky.App., 555 S.W.2d 605 (1977).

23. Ky., 418 S.W.2d 245 (1967).

stance, the mother was on notice that she would need to prevent her child from engaging in the same act. Additionally, the child was within the mother's immediate area of control (*i.e.*, they were both in the same car) at the time he opened the door.[24]

In this case, no similar evidence as to the Carneals has been developed. There is no evidence that Michael Carneal ever exhibited violent tendencies toward anyone. Evidence has been presented that he would, on occasion, take out his frustrations by beating a barrel in the backyard. However, Michael Carneal's frustration was never directed toward any person, so it cannot be said that this behavior was somehow an indicator that he would shoot his fellow students.

Additionally, it has been shown that Michael Carneal stole a gun from his father and took it to school to sell. Once again, although this behavior may be criminal, it is not violent in any way. The appellants have failed to show how this behavior should somehow serve as an indicator of a propensity for homicide. In any event, there is no proof that Michael Carneal's parents had any knowledge that their son had taken his father's gun until after he shot his fellow students.

Appellants also argue that because Michael Carneal had accessed violent and pornographic materials on the Internet from the family computer, and had once accessed the Playboy website from a school computer, his parents should not only have known about the existence of the materials, but should have considered them indicia of a propensity for homicide. We, like the circuit court, fail to see the connection.

There is no evidence that the Carneals knew this material was on the family computer. Appellants argue that because it

was there, the Carneals should have discovered it. We decline to go this far. Even without Michael's efforts to hide these materials, it would still have been difficult, and perhaps impossible, for the Carneals to have discovered the files on the hard disk drive. Even had they discovered it, it cannot be seriously argued that the discovery that an adolescent male has been looking at pornographic matter is somehow a warning sign of impending homicide. While there is proof that some of the materials contained violent subject matter, we are unpersuaded that it should have some unique significance. In our society, unfortunately, adolescents are exposed to violence of all sorts, be it in movies, television or print. We attach no particular significance to the fact that this sort of material was available on the Internet.

Although it may be belaboring the obvious, Michael Carneal was not under the immediate control of his parents at the time he stole the pistol and ammunition used in the shootings, nor at the time of the actual shootings themselves. In *Moore*, the parent was in a position to stop the child from acting at the time he caused the accident. Here, however, the Carneals were not in a position to stop Michael immediately before he began shooting. While he did have guns at home that morning, there is no evidence that he acted in a manner so as to arouse a suspicion in the minds of his parents that they should intervene. Their inquiries were met with an explanation that he had been working on an English project for school, which accounted for the sounds of tapping coming from his room the night before, and the large bundle (which later turned out to be guns) Michael carried with him to school on the morning of the shootings.

24. *Id.* at 247–248.

That explanation was reasonable under the circumstances, and cannot be said to have put the Carneals on notice of a need to prevent their son from acting.

While we agree that parents can in proper cases be held liable for their own negligence in failing to control their children, this is not such a case. Appellants have failed to present any evidence which shows that the Carneals knew or should have known that they needed to exercise the control over their son necessary to prevent him from shooting his classmates. Because there is no genuine issue of material fact as to their alleged negligence, we affirm the summary judgment granted John and Ann Carneal.

### *Appellants' Complaint Fails to State a Cause of Action Against Michael Carneal's Classmates Trent Matthis, Sam McReynolds, Alan Coleman, Ryan Cornille, Jay Massie, Sara Culp, Amanda Jones, Ben Strong, Becky Flynn and Robert Teer*

Appellees Matthis, McReynolds, Coleman, Cornille, Massie, Culp, Jones, Strong, Flynn and Teer moved the circuit court to dismiss the complaint against them for failure to state a claim upon which relief can be granted pursuant to CR 12.02, and the circuit court dismissed the complaint on that basis. All of the aforementioned parties were classmates of Michael Carneal, and the specific allegations against Matthis, McReynolds, Coleman, Cornille and Massie are contained in the following paragraphs of appellants' complaint:

27. Defendants Trent Matthis, Sam McReynolds, Alan Coleman, Jeremy Ellis and Ryan Cornille were aware that Michael Carneal had brought guns to school prior to the shootings. They did nothing to alert officials.

29. Defendant Jay Massie bought a pistol from Michael Carneal approxi-

mately two months before the shootings. He knew that Michael Carneal did not own the pistol, but that it instead was owned by John Carneal. He nonetheless resold it to one Jesse Hall. Massie told no one in authority about the weapon.

68. Several months prior to the shootings, Michael Carneal had taken his father's .38 caliber pistol to school and showed it to Jay Massie. It was one of several times that Carneal had taken the pistol to school and showed it to other students.

69. Massie told Michael Carneal to give him the gun, or he would call the cops and get Michael in trouble. Massie promised to pay Michael $100.00 for the gun. Carneal complied.

70. Jay Massie then took the gun and sold it to Jesse Hall for $50.00.

86. Defendants Trent Matthis, Sam McReynolds, Alan Coleman, Jeremy Ellis and Ryan Cornille knew that Michael Carneal had brought guns to school on numerous occasions in violation of KRS 527.070. Despite their duty to do so, they told no one. Their failure to do so caused the deaths of the Plaintiff's decedents, for which they are liable.

In a separate complaint, the appellants made the following allegations against appellees Culp, Strong, Jones, Flynn and Teer:

15. On December 1, 1997, Michael Carneal shot and killed Jessica James, Kayce Steger and Nicole Hadley during a voluntary prayer session at Heath High School.

16. Defendants knew or should have known that Michael Carneal was plotting the deaths of Jessica James, Kayce Steger, and Nicole Hadley.

17. Defendants had a duty to take action to prevent Michael Carneal from committing the above-mentioned crimes. 18. Defendants breached their duty by failing to warn of Michael Carneal's plan.

Identifying a duty is a question of law for the court, and for the purposes of the CR 12.02 motion to dismiss the complaint for failure to state a claim upon which relief can be granted, the circuit court was required to assume the allegations of the complaint were true. We must do the same for the purposes of this appeal, and our review is *de novo* as previously indicated. Even assuming those allegations to be true, however, no claim upon which relief can be granted under Kentucky law is presented, and the circuit court correctly dismissed the actions against these appellees as evidenced by the discussion below.

■■■■■■ It is elemental tort law that a negligence action requires: (1) a recognized duty; (2) a breach of that duty; and (3) consequent injury. When a court resolves a question of duty it is making a policy determination; and when no legal duty is found to exist, further analysis is unnecessary.[25] Appellants have argued that Kentucky Revised Statutes (KRS) 527.070, which proscribes the unlawful possession of a weapon on school property, imposed a duty on the appellees to report to school officials that alleged violations of the statute occurred. In fact, no such obligation exists. KRS 519.030 addresses the obligation to report alleged criminal activity. In the commentary to that statute, the drafters expressly state that: "One who merely fails to report a crime commits no offense."[26] Apparently acknowledging the absence of any such statutory duty, appellants contend that there

is a universal civil duty which applies to all members of society, thereby operating to hold these appellees accountable for failing to report Carneal's conduct. Whether such a duty actually exists or should exist is the specific question presented for discussion.

While appellants concede that "the common law has never held that people have an affirmative duty to act for the protection of others, in this instance, report criminal conduct," and go on to state that "[i]nstead, the common law has historically held that there is no duty to aid another absent a special relationship unless the actor caused the peril," they argue that a change in the common law is in order. While we agree that the common law should not be stagnant and must periodically be revised, we decline to adopt the unworkable standard suggested by the appellants.

■■■■ It is well settled in Kentucky jurisprudence that there is no legal duty to report the commission of a crime by another, let alone the possibility of a crime being committed by another. Both common law and, as indicated above, statutory law, have consistently upheld this fundamental principle. There does not appear to be any Kentucky case exactly on point. However, the *Restatement (Second) of Torts* has adopted two rules which are pertinent to the now familiar facts from which the current claims derive.

Section 314 of the *Restatement* entitled **Duty to Act for Protection of Others,** reads as follows: "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Comment (c) to Section 314 clarifies this point: "The

---

25. *See Mullins v. Commonwealth Life Ins. Co.,* Ky., 839 S.W.2d 245 (1992).

26. *Criminal Law of Kentucky,* Ch. 519 at 1049–1050 (West Group 2000–01).

rule stated in this Section is applicable irrespective of the gravity of the danger to which the other is subjected and the insignificance of the trouble, effort, or expense of giving him aid or protection." To ensure that no doubt remains as to the implications of this rule, comment (c) goes so far as to say that:

> The result of the rule has been a series of older decisions to the effect that one human being, seeing a fellow man in dire peril, is under no legal obligation to aid him, but may sit on the dock, smoke his cigar, and watch the other drown. Such decisions have been condemned by legal writers as revolting to any moral sense, but thus far they remain the law.

An exception to the general rule is carved out in *Restatement* Section 314A, entitled **Special Relations Giving Rise to Duty to Aid or Protect,** which provides that:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>
>> (a) to protect them against unreasonable risk of physical harm, and
>>
>> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2) An innkeeper is under a similar duty to his guests.
>
> (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
>
> (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

In the comments relating to this exception it is noted that the employer/employee relationship gives rise to a similar duty; and allowance is made for other such relations, for example that of husband and wife, where the law appears to be slowly evolving toward a recognition of the duty to aid or protect. It is clear that all of the duties listed in this section of the *Restatement* arise out of a special relationship between the parties, which in turn creates a special responsibility, thereby removing the case from the purview of the general rule.

■ Also relevant for present purposes is *Restatement* Section 315, entitled **Duty to Control Conduct of Third Persons, General Principle,** a special application of the general rule stated in Section 314, which provides as follows:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
>> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>>
>> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

The question of whether one individual owes another a duty to warn of impending criminal conduct must be interpreted in light of these *Restatement* provisions. As illustrated above, absent a special relationship, there is no duty to warn another of a potentially criminal act of a third person. No such special relationship exists here. Instead, appellants propose a new rule of law founded upon a "universal duty of care" requiring persons to take affirmative steps to prevent third parties from committing criminal acts.

Appellants cite *Grayson Fraternal Or-*

*der of Eagles v. Claywell*[27] as authority for the proposition that Kentucky has adopted a universal duty of care applicable to all people in every situation. *Grayson* is cited often by parties advocating a theory of liability or a cause of action where none previously existed and legal authority is otherwise lacking. Despite its use of the catch phrase "universal duty of care," the *Grayson* case itself demonstrates that the duty referred to is not without limits. Subsequent decisions illustrate that the duty has been narrowly applied, thereby undermining appellants' reliance on *Grayson*.

*Grayson* centered around a specific fact pattern distinguishable from the present case in that the issue was whether and under what circumstances one may recover damages against a dram shop furnishing intoxicating liquor to a person actually or apparently under the influence of alcohol, who, because of his intoxicated condition, subsequently injures another person.[28] The Kentucky Supreme Court, in finding that a common law action for negligence exists under these limited circumstances, upheld the general rule that every person owes a duty of care to every other person to exercise ordinary care in his activities to prevent foreseeable injury and stated that no reason exists to create a privilege against, or an immunity from, its application to dram shop liability.

> We hold simply that the standard expressed in the statute, the violation of which could result in a criminal sanction against a licensee, is misconduct of a nature which will result in civil liability under the negligence principle, as a failure to exercise reasonable care, when

the evidence establishes circumstances from which a jury could reasonably infer that the subsequent accident was within the scope of the foreseeable risk.[29]

However, the Court specifically limited the application of its holding by noting that the statute referred to in the opinion only establishes the standard of care owed to a business invitee.[30]

The bartender in *Grayson* was an actor who directly contributed to a condition that created a risk of harm through his deliberate actions. Certainly, the "universal duty" applies to individuals who intentionally engage in affirmative action which assists someone else in causing harm to another or contributes to such a result. Contrary to the appellants' contention, however, *Grayson* does not support a finding of liability in reference to the student appellees because the allegations are not that they provided assistance of any kind to Carneal either before or during the shootings.

A review of cases subsequent to *Grayson* is instructive at this point in our analysis. In *Evans v. Morehead Clinic*,[31] a shooting victim brought a personal injury action against physicians who had treated his assailant. After reviewing *Restatement* Section 315 and case law from other jurisdictions, this Court concluded that the appellant could maintain a cause of action since the relationship of a psychiatrist or therapist and a patient is a special relation resulting in duties to third persons.[32] Accordingly, we held that if a psychiatrist or therapist determines, or under the applicable standards of his profession reasonably should have determined, that his patient

---

27. Ky., 736 S.W.2d 328 (1987).

28. *Id.*

29. *Grayson, supra,* n. 27, at 334.

30. *Id.* at 332, 337.

31. Ky.App., 749 S.W.2d 696, 699 (1988).

32. *Id.*

poses a serious risk of violence, he has a duty of ordinary care to protect a reasonably foreseeable victim of that danger, with foreseeability encompassing victims specifically identified and/or those readily identifiable.[33] The question was whether the psychiatrist or therapist exercised reasonable care under the circumstances. Again, the absence of a special relationship between the appellees and the victims removes the present case from the boundaries of this holding, as does the foreseeability component, since Carneal's potential victims were not readily identifiable.

Another case which interpreted the universal duty of care arose when an injured child brought a personal injury action against the owner of a farm on which horses were kept. In *North Hardin Developers, Inc. v. Corkran*,[34] the Supreme Court held that horses kept on a farm in close proximity to a residential subdivision were not an "attractive nuisance" within the meaning of the exception to the rule that a landowner is not ordinarily liable to trespassers.[35] In so doing, the Court indicated that prior to application of the universal duty of care to a particular fact pattern, it must appear that the harm was foreseeable, and foreseeability is to be determined by viewing the facts as they reasonably appeared to the party charged with negligence, not as they appear based on hindsight.[36] In defining what constitutes an unreasonable risk of harm, the Court recited the following explanation by Dean Prosser:

Nearly all human acts, of course, carry some recognizable but remote possibility of harm to another.... Those against which the actor is required to take precautions are those which society, in general, considers sufficiently great to demand them. No man can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded.[37]

Although Carneal's behavior prior to the shootings arguably conveyed that he was troubled, his extreme and violent action toward his classmates was not only so unlikely as to be disregarded, but was not even considered a possibility.

The necessity of both a special relationship and foreseeability was again acknowledged in *Fryman v. Harrison*,[38] a case involving an assault victim who sued a county, the county's jailer and a circuit clerk alleging that they negligently released his assailant from jail. The Court, when applying the duty of care to the circumstances in question, held that "there was no individual duty to protect against the ultimate injury because the harm was not foreseeable and the victim was not identifiable when the facts are viewed as they reasonably appeared to the parties charged with negligence."[39] The Court began its analysis by stating that the major issue is the question of foreseeability and the requirement of a "duty to all" is a

33. *Id.* at 699.

34. Ky., 839 S.W.2d 258 (1992).

35. *Id.*

36. *Id.* at 261 (citing *Mitchell v. Hadl*, Ky., 816 S.W.2d 183 (1991)). *See also Napper v. Kenwood Drive In–Theatre Co.*, Ky., 310 S.W.2d 270 (1958); *Vaughn v. United States*, 933

F.Supp. 660 (E.D.Ky.1996); *Grisham v. Wal–Mart Stores, Inc.*, 929 F.Supp. 1054 (E.D.Ky. 1995).

37. *Id.* at 261, 262 (citing Wm. Prosser, *Torts* § 31 (1978)).

38. Ky., 896 S.W.2d 908 (1995).

39. *Id.* at 911.

beginning point for any duty analysis.[40] The requirement of a special relationship was again upheld when the Court considered whether the defendants had a duty to prevent a known assailant from harming another victim and concluded that: "In order to establish an affirmative legal duty on public officials in the performance of their official duties, there must exist a special relationship between the victim and the public officials."[41] The plaintiff's interpretation of the "universal duty of care" was rejected by the Court when it emphasized that in order to determine whether a duty existed in a particular situation, the examination must be focused so as to determine whether a duty is owed with consideration being given to public policy and statutory and common law theories.[42] By way of further clarification, the Court stated that the question in any negligence action is whether the defendant owes a legal duty to the plaintiff, and the particular circumstances of the case must be considered in ascertaining whether a duty is owed. In order to establish a negligence claim against a public official, "the complaint must allege a violation of a special duty owed to a specific identifiable person and not merely the breach of a general duty owed to the public at large."[43]

In noting that *Grayson* and *Evans* were not controlling in the action, the Court said:

> [*Grayson*] involved a situation where a bartender consciously and actively assisted an intoxicated patron in committing the illegal act of driving while drunk. Here, neither Davis nor Fryman assisted Custard in the crime of assaulting Harrison which occurred several months after he was released. In

*Grayson*, the bartender supplied the alcohol which enabled the patron to commit the illegal negligent act in driving while drunk. Neither Davis nor Fryman took any role in the criminal act of the assault by Custard.

*Evans* … limited the duty to protect to the reasonably foreseeable victims of a particular danger. The Court stated "[t]his foreseeability encompasses victims specifically identified and those readily identifiable." In this case, the Court of Appeals went beyond the holding of *Evans*, to create a duty to protect a victim who was not known or identifiable or foreseeable. *Evans* is not controlling of this case because neither Davis nor Fryman knew that Custard would injure Harrison as opposed to any other member of the public. In *Evans*, the victim was identifiable.

The assault by Custard was an intervening or superseding cause which was not under the control of either Davis or Fryman. The question of whether an undisputed act or circumstance is a superseding cause is a legal issue for the court to resolve and not a factual matter for the jury. There was no dispute that the claimed act of negligence or the assault actually occurred. Thus the issue was not a mixed question of law and fact. The matter on review is the proper application of CR 12.02 as to dismissal. We find no error in regard to the action by the circuit judge.[44]

The reasoning set forth above is applicable to the issue presented for resolution. As a threshold matter, we again note the absence of a special relationship between Michael Carneal's classmates and the vic-

---

**40.** *Id.* at 909.

**41.** *Id.* at 910.

**42.** *Id.* at 909.

**43.** *Id.* at 910.

**44.** *Id.* at 910, 911 (citation omitted).

tims. In addition, none of these classmates are accused of playing an active role in Carneal's violent mission. They are instead charged with, at most in the case of Massie, allegedly purchasing a gun from Carneal (no allegation that it was the same one used by Carneal to perpetrate the shooting) over one month before the shooting, and at least, failing to report Carneal for previously having a gun at school. Carneal's victims were in no way readily identifiable or foreseeable. To the extent any mention was made of the impending tragedy, it was vague and taken in jest. Finally, it is difficult to imagine a more definitive example of a superseding or intervening cause than Carneal's devastating attack on December 1, 1997.

However, *Restatement* Section 302B provides that an act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal. In accordance with this provision, this Court permitted a negligence action against the Housing Authority of the City of Paducah to proceed after determining that the record reflected knowledge by personnel at the Housing Authority that the decedent had received repeated death threats from another tenant and that crimes had frequently occurred at the complex. Despite this knowledge, the Housing Authority took no action to evict the tenant who made the threats or otherwise to discourage his presence in the area, and no security guards were retained to patrol the area at the time of the shootings, inaction which placed the Housing Authority conduct

within the parameters of *Restatement* Sections 302B and 449 and constituted sufficient evidence to raise a jury question on the issue of proximate cause.[45] *Waldon* differs from the present case for that very reason. No such knowledge is alleged on the part of the appellees. No evidence of record supports the appellants' conclusory allegations regarding duty and causation. Similarly, we found no error in the dismissal of the complaint against the City of Paducah in *Waldon* because the appellant did not allege that the City breached any duty to her other than "a vague allegation of failure to provide adequate police protection to the area;" and, absent an allegation of a "special duty" owed to the victim, there was no basis for a tort claim.[46]

The holding in *Fryman* was deemed to be dispositive in a later case involving the administrators of the estates of persons killed by escaped inmates who sought compensation through the Board of Claims.[47] After agreeing with the finding of the Board of Claims that the Corrections Cabinet had a duty to prevent the escape of inmates from the Kentucky State Penitentiary, the Supreme Court rejected the claim that the Corrections Cabinet owed a duty to the victims to protect them from harm caused by the escapees since they were not readily identifiable as persons likely to be injured as a result of the escape and no "special relationship" existed between the victims and the Cabinet which would impose a duty upon the Cabinet to protect the victims, as opposed to the public as a whole, from harm.[48]

This Court was once again confronted with a case which mandated further interpretation of the principles derived from

45. *Waldon v. Housing Authority of Paducah,* Ky.App., 854 S.W.2d 777 (1991).

46. *Id.* at 779, 780.

47. *Commonwealth, Corrections Cabinet v. Vester,* Ky., 956 S.W.2d 204 (1997).

48. *Id.* at 206.

*Grayson* when the administratrix of the estate of a student who was mortally wounded by a gun that had been removed from a home brought suit against the insureds and their homeowners' insurance carrier. In *Sheehan v. United Services Auto Ass'n*,[49] the crux of the appeal was whether USAA, as the provider of a homeowners' policy to the insureds, owed a duty of care to the decedent. Having found no precedent which imposed such a duty on USAA nor any public policy considerations which supported such a duty, we held that the insurer owed no duty to a third party to conduct a risk assessment of its insureds and to educate them in the safe storage of weapons and ammunition or to offer incentives to encourage responsible ownership of firearms.[50] In making this determination, we reaffirmed the rule that an insurer owes no general duty to inspect, or to warn or to safeguard against, or to remedy a dangerous condition existing on the premises of an insured party. However, we went on to note an exception to the general rule—that if the insurer has voluntarily undertaken inspection for the benefit of the insured or the parties have contracted for inspection, a duty may arise, consistent with the exception that one who volunteers to act, although under no duty to do so, is charged with the duty of acting with due care.[51] Clearly, this language implies that a special relationship is required for a duty to arise and, absent such a relationship, a person is not under a duty to warn or safeguard a third person. As was the case in *Sheehan*, the exception does not apply here because none of Carneal's classmates are charged with voluntarily undertaking action for the benefit of the victims and, as repeatedly stated, the exception for special relationships does not apply.

█ Appellants begin their argument that the universal duty of care should be applied without restriction by citing the English philosopher John Locke and continue by providing statistics on school-based violence which understandably generate concern, but are not legally persuasive. The preceding review of relevant case law makes it abundantly clear that a lack of binding authority is the reason for that strategy. While we agree that the law must adapt to the changing needs of society and that civic responsibility is desirable and even necessary, the respect for existing law is an equally fundamental principle and one which dictates the outcome in this case.

> The right of recovery afforded by the law for losses occasioned by negligence is necessarily limited to those losses which occur in the breach of a legal duty and not for the failure to observe moral or humane obligations. Such limitation is necessary to restrain the law's remedies from being pushed to an impracticable extreme.[52]

Contrary to the assertions made by appellants, a proper interpretation of *Grayson* and its progeny is consistent with this line of thinking and does not support the proposition that everyone owes an unlimited duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury.

With the foregoing legal background and viewing the actions of Carneal's classmates in the context of the circumstances as they were at the time rather than with the benefit of hindsight, we are unable to

49. Ky.App., 913 S.W.2d 4 (1996).

50. *Id.* at 5, 6.

51. *Id.* at 6.

52. *Toadvine v. Cincinnati Railway Co.*, 20 F.Supp. 226, 227 (E.D.Ky.1937).

state that the deceased or injured students were foreseeable or readily identifiable victims. Likewise, no special relationship existed between the students who allegedly knew that Carneal had previously brought guns to school and in one case purchased a gun from Carneal, and the students who were victimized by Carneal's violent actions which would give rise to a duty to warn others about his potential future conduct. In the absence of a duty, further analysis is unwarranted. Accordingly, we agree that the complaint failed to state a cause of action against Carneal's classmates and that the complaint against them was properly dismissed.

An identical claim was made against the student appellees named below who are also charged with civil conspiracy and negligent encouragement. As the duty to warn analysis contained herein is equally applicable to those students, it is determinative with respect to that allegation. Our discussion of the claims against those students will therefore be restricted to the allegations of civil conspiracy and negligent encouragement.

### Inadmissible Hearsay Cannot Serve as the Basis For a Claim of Civil Conspiracy or Negligent Encouragement; Post Arrest Statements of Michael Carneal are Inadmissible Hearsay; Summary Judgment as to Michael Alonso, Matthew Barnett, Jeremy Ellis, Toby Nace, James O'Nan and Mike Zink was Proper

Appellants allege that the group of students named above not only knew of Carneal's plan but played an active role in its development. The circuit court determined that the presence of the students at the scene of the shootings, participation in previous conversations about taking over the school, utilization of ear plugs and, in the case of Alonso, permitting Carneal to store guns in his room and engaging in target practice the Saturday before the shootings did not constitute actions *during the course of or in furtherance of a conspiracy,* if in fact such a conspiracy existed. The fact that Carneal had several guns in his possession when he shot and killed three students and wounded five others by itself was also deemed to be insufficient proof that the weapons were intended to be used by other students. After noting that the only evidence to support any of the allegations was McCracken County Deputy Sheriff Hayden's testimony as to Carneal's statement to him three days after the shootings, and concluding that the burden of proof as to the prerequisites set forth in Kentucky Rules of Evidence (KRE) 801A (b) and (5) had not been satisfied, the court granted these students' motions for summary judgment. As will become evident from the following discussion, further elaboration as to the specific facts at issue is not required because the post-arrest statements of Carneal to the deputy sheriff and forensic psychiatrists are the only proof that the alleged conspiracy or negligence occurred, and the statements are inadmissible.

A conspiracy is inherently difficult to prove. Notwithstanding that difficulty, the burden is on the party alleging that a conspiracy exists to establish each and every element of the claim in order to prevail.[53] We begin our analysis with a definition of the term civil conspiracy, a topic rarely dealt with in Kentucky case law. In *Smith v. Board of Education of Ludlow,*[54]

---

53. *Krauss Wills Co. v. Publishers Printing Co.,* Ky., 390 S.W.2d 132, 134 (1965).

54. 264 Ky. 150, 94 S.W.2d 321 (1936). *See also McDonald v. Goodman,* Ky., 239 S.W.2d 97, 100 (1951) (adopting the definition of civil

Kentucky's highest court defined civil conspiracy. "As a legal term the word 'conspiracy' means a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." [55] The Supreme Court reaffirmed this definition when it again addressed the issue of conspiracy in *Montgomery v. Milam.*[56] The Court emphasized that in order to prevail on a claim of civil conspiracy, the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act.[57]

Our attention must then shift to determine what is meant by "concerted action." Kentucky's highest court provided direction as to the necessary components of a conspiracy in the case of *Davenport's Adm'x v. Crummies Creek Coal Co.*[58] in which the decedent's personal representative sued a coal company alleging that a conspiracy was formed between the company and its employees to commit a wrongful act resulting in the death of an innocent party. The Court held that before a conspiracy can be found, a "necessary allegation is that the damage or death resulted from some overt act done pursuant to or in furtherance of the conspiracy." [59] The Court acknowledged that there is no such thing as a civil action for conspiracy, noting that the action is for damages caused by acts committed pursuant to a formed conspiracy. In the absence of such acts done by one or more of the conspirators and resulting in damage, no civil action lies against anyone since the gist of the civil action for conspiracy is the act or acts committed in pursuance of the conspiracy, not the actual conspiracy.[60]

In *Farmer v. City of Newport,*[61] this Court analyzed a civil conspiracy claim in the context of a product liability action. In so doing, we referenced *Restatement (Second) of Torts,* Section 876, relative to "concert of action":

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct separately considered, constitutes a breach of duty to the third person.[62]

Based upon these requirements and consistent with Kentucky authority, we held that if the plaintiffs could prove that the manufacturers acted tortiously, pursuant to a common design, or rendered substantial assistance to others to accomplish a tortious act, they could maintain a viable claim based on concert of action.[63]

Clearly, the law in Kentucky requires the actual commission of the tortious act or a concert of action where

conspiracy set forth in *Smith v. Board of Education of Ludlow*).

55. *Id.* at 325.

56. Ky., 910 S.W.2d 237 (1995).

57. *Id.* at 239.

58. Ky., 299 Ky. 79, 184 S.W.2d 887 (1945).

59. *Id.* at 888.

60. *Id.*

61. Ky.App., 748 S.W.2d 162 (1988).

62. *Id.* at 164.

63. *Id.*

substantial assistance has been provided in order for liability to attach based on a civil conspiracy theory. In the present case, appellants have failed to produce evidence that any of the alleged co-conspirators participated in an act in furtherance of the alleged conspiracy.

■ As to the negligent encouragement claims, the appellants concede that *Restatement (Second) of Torts*, Sections 289, 302 and 303 have not been specifically adopted in Kentucky. Even if we were to adopt the aforementioned *Restatement* sections, however, appellants have also failed to produce any evidence to support their claims that the appellees negligently encouraged Carneal to commit the heinous acts of violence which ultimately led to this litigation. "Evidence" necessarily implies evidence that would be admissible at trial. Carneal's statements, the sole evidence relied upon by appellants to support their claims of civil conspiracy and negligent encouragement, constitute inadmissible hearsay[64] and are therefore not admissible to defeat a motion for summary judgment.

Appellants, however, argue that any one of several different hearsay exceptions should be applied to remove Carneal's post-arrest, out-of-court statements from the category of inadmissible evidence. We shall address each contention.

■ Appellants' first argument that Carneal's post-arrest statements are admissible against the appellees is based on Kentucky Rules of Evidence (KRE) 801A(b)(1) which governs admissions of parties. The pertinent section reads as follows:

(b) Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is:

(1) The party's own statement, in either an individual or a representative capacity[.]

This rule makes it clear that admissions of a party can only be admitted into evidence against the party who is charged with making the statement sought to be admitted and not against co-parties of the declarant.[65] Accordingly, Carneal's statements could *only* be admitted against him, not against his fellow students.

■ Next, appellants contend that the statements at issue constitute adoptive admissions pursuant to KRE 801A(b)(2) which provides:

(b) Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is:

(2) A statement of which the party has manifested an adoption or belief in its truth[.]

Noticeably lacking in reference to this argument is any effort to articulate facts which support the allegation that the student appellees somehow manifested an adoption or belief in the purported truth of Carneal's statements.

■ Professor Lawson classifies adoptive admissions by distinguishing between "admissions by conduct" and "admissions through silence."[66] *Griffith v. Common-*

---

64. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ky. R. Evid. (KRE) 801(c). "Hearsay is not admissible except as provided by [the KRE] or by rules of the Supreme Court of Kentucky." KRE 802.

65. *See* Robert Lawson, *The Kentucky Evidence Law Handbook*, § 8.15 (3d ed.1993).

66. *Id.*, § 8.20 at 388.

*wealth*[67] is cited by Lawson as illustrative of the kind of behavior which can serve to manifest acquiescence in the truth of another's statements as mandated by this exception. *Griffith* indicates that voluntary conduct by the party "adopting" the admission exhibits some act of the mind and may be regarded as a display of the consciousness of guilt.[68] Carneal's statements were made in the presence of law enforcement officials or health care professionals; none of the alleged co-conspirators were present. Obviously, they were not in a position to display behavior or engage in conduct which would indicate an adoption of his statements as their own admissions.

■ Admissions can also occur by silence. In order to qualify as an admission adopted by silence, several elements must be present. Perhaps the most fundamental requirement is that the party must hear and understand the statement.[69] The party sought to be charged with the admission must also remain silent under circumstances which call for a negative reply.[70] No acquiescence in the truth of the statement may be implied unless the party against whom the statement is sought to be introduced was free to act or speak regarding it at the time it was made.[71] Again, none of the appellees was present at the time Carneal's statements were made, so that application of the above precepts requires the exclusion of Carneal's statements.

■ KRE 804(b)(3) is the next basis upon which appellants argue that Car-

neal's statements are admissible. The rule, in relevant part, states:

> Hearsay exceptions. The following are not excluded by the hearsay rule *if the declarant is unavailable as a witness:*
>
> * * *
>
> (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability is *not* admissible *unless* corroborating circumstances clearly indicate the trustworthiness of the statement. (Emphasis supplied.)

Apparently, this argument stems from the appellants' belief that Carneal will be unavailable for trial. Appellants never sought or obtained a ruling from the circuit court that Carneal was unavailable for trial. Accordingly, they are precluded from making such an argument on appeal.

■ While Carneal's physical presence at trial would undoubtedly pose obstacles, it is not an impossibility, and his testimony via deposition is available for use at trial. KRE 802 provides that hearsay is not admissible except as provided by the Rules of Evidence or by other rules adopted by the Supreme Court of Kentucky. The Rules of Civil Procedure are based on the premise that live testimony is more reli-

---

67. 250 Ky. 506, 63 S.W.2d 594 (1933) (overruled on other grounds by *Colbert v. Commonwealth*, Ky., 306 S.W.2d 825 (1957)).

68. *Id.* at 596.

69. *Broadway Coal–Mining Co. v. Ortkies*, 200 Ky. 8, 254 S.W. 434, 437 (1923).

70. *Ray v. Ray*, 196 Ky. 579, 245 S.W. 287, 290 (1922).

71. *Id.*

able than a deposition, and if a witness is available to testify his deposition cannot be used except for impeachment. However, there are circumstances where a witness cannot testify or to do so would cause a substantial burden.

 The deposition of a witness that does not qualify under CR 32.01 may nevertheless be read at trial as substantive evidence if, in the estimation of the trial court, such exceptional circumstances exist as to make it desirable in the interest of justice with due regard to the importance of presenting oral testimony according to CR 32.01(c)(xii). In the event that Carneal's physical presence at trial became unfeasible due to his imprisonment or other cause, he is still available as a witness via his lengthy deposition. Therefore, KRE 804(b)(3) does not apply in this case.

 Whether or not Carneal is available to testify upon the trial of these actions, KRE 804(b)(3) still eliminates his statements from consideration because no corroborating circumstances exist which clearly indicate their trustworthiness, a prerequisite for admissibility. Due to their inherent unreliability, some jurisdictions have adopted a blanket prohibition against the use of such statements. Others, including Kentucky, utilize an approach which involves strict scrutiny of the circumstances surrounding the statements. The Kentucky Supreme Court adopted the reasoning of the United States Court of Appeals for the Fifth Circuit in the leading case on the subject, *Dodson v. Commonwealth*,[72] by restating a number of reasons which cast doubt on the credibility of an inculpatory statement from a confessing codefendant including: the potential for coercion, the desire to curry favor from the arresting officer, the need to alleviate

culpability by implicating others, the desire for revenge against a third party and the ability to entertain a favorable plea agreement. After listing and applying these factors, the Court determined that a statement against interest made by an unavailable witness which inculpates another person is inadmissible unless there are corroborating circumstances which clearly indicate its trustworthiness.[73] As previously noted, Carneal's statements to a deputy sheriff and mental health professionals are the only evidence offered to support the allegations of conspiracy and negligent encouragement. Because Carneal's statements are uncorroborated, whether or not he is available for trial, the statements are inadmissible.

 Appellants' final attempt to have Carneal's statements admitted rests on KRE 801A(b)(5), an exception to the hearsay rule addressing statements made *during the course* and *in furtherance of* a conspiracy. Appellants do so after making the blanket statement that application of KRE 805, pertaining to hearsay within hearsay, operates to remove the statements from the general rule of inadmissibility. KRE 801A(b)(5)provides, in pertinent part, that:

> (b) Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is: ... (5) A statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

 In applying this principle, we must first turn our attention to KRE 104(a) which pertains to questions of admissibility generally and which indicates that preliminary questions concerning the

---

72. Ky., 753 S.W.2d 548, 549 (1988).

73. *Id.*

admissibility of evidence are to be determined by the court subject to the provisions of subsection (b) which relates to relevancy conditioned on fact. In the context of KRE 801A(b)(5), appellants have the burden of proving, by a preponderance of the evidence, certain foundational facts before Carneal's statements could be considered by the court as potential exceptions to the hearsay rule. Lawson provides guidance on the subject relating to co-conspirators, noting that a party offering hearsay under KRE 801A(b)(5) "must prove the elements of conspiracy as well as participation in same by the declarant and the party against whom the hearsay is offered." [74] As a threshold matter, we must determine whether the appellants made a *prima facie* showing that a conspiracy existed by independent evidence.

In *Ray v. Commonwealth*,[75] the Supreme Court ruled that a confession by a co-conspirator made approximately two weeks after a burglary had been improperly admitted as evidence, recognizing that the Commonwealth submitted no additional proof as to the existence of any conspiracy. The Court emphasized that the confession should not have been admitted because there was no *prima facie* showing of a conspiracy and went on to conclude that even after independent proof of a conspiracy is shown, such statements are admissible only if the statements were made during and in furtherance of the conspiracy.[76] Similarly, no *prima facie* case of conspiracy has been made here, thereby rendering Carneal's post-arrest statements inadmissible on yet another basis.

Carneal's statements were made after the shootings ceased and any conspiracy had ended. KRE 801A(b)(5) requires that a statement by a co-conspirator be made *during the course and in furtherance of the conspiracy*. In *Perdue v. Commonwealth*,[77] a case misapplied by the appellants, the Court reiterated this principle.[78] While it is true that the Court allowed a co-conspirator's statement to be introduced into evidence, in doing so, the Court was careful to explain that the requirements of KRE 801A(b)(5) had been met. After observing that evidence had been presented illustrating that the purpose of the conspiracy was murder for profit with payment to be made from insurance proceeds, the Court concluded that the statements made in furtherance of the conspiracy by the co-conspirators concerning their continuing endeavor were admissible as the *object of the conspiracy had not yet been accomplished*.[79] Neither of the aforementioned prerequisites are met by the statements that generated the current debate. The following summary, found in the discussion following KRE Chapter 801A, best captures the meaning of KRE 801A(b)(5):

> To utilize this exception, the proponent must establish that there was a conspiracy, that both the declarant and the party against whom the statement is offered were members of the conspiracy, and that the statement, in fact, furthered or advanced the conspiracy. In regard to the last element, a confession to the police would not advance a conspiracy—unless, perhaps, it was part of

---

74. Lawson, *supra*, n. 65, § 8.30.

75. Ky., 284 S.W.2d 76, 77 (1955).

76. *Id.* at 78.

77. Ky., 916 S.W.2d 148, 158 (1995).

78. *See also Marshall v. Commonwealth,* Ky., 60 S.W.3d 513, 520 (2001).

79. *Id.*

some cleverly crafted coverup or ongoing plan.[80]

No coverup existed or was even alleged in the present case.

As evidenced by the preceding discussion, Carneal's post-arrest, out-of-court statements to a deputy sheriff and forensic psychiatrists are hearsay without an applicable exception since the prerequisites of the relevant rules cannot be satisfied. Accordingly, the statements are inadmissible and cannot be used to validate the claims of civil conspiracy and negligent encouragement against the appellees. As the statements in question were the only evidence submitted in support of these claims, no genuine issue of a material fact exists with respect to these issues, and summary judgment was properly granted to the above-named student appellees.

### The School Employees are Protected by the Doctrine of Official Immunity

Thirty of the defendants in the original action which resulted in the present litigation were either school board members, administrators or certified teachers employed by the McCracken County School District. The school board members and employees were allegedly negligent in failing to implement safety measures to properly protect the student body, detect and prevent the shootings and take any action regarding Carneal's disciplinary problems. In addition to the failure to address Carneal's disciplinary problems, the allegations regarding the teachers also include the failure to notify either school officials or Carneal's parents that for class assignments Carneal was writing violent stories centered around the death of classmates and taking over the school by force. Such

intervention allegedly would have prevented the deaths of Carneal's victims.

Relying on *Franklin County, Ky. v. Malone*[81] and *Withers v. University of Kentucky*,[82] the circuit court granted the motion to dismiss the complaint against the school employees for failure to state a claim upon which relief can be granted on the basis of sovereign immunity; and the first appeal to this Court was filed. The appellants filed their second complaint shortly thereafter, naming eight additional defendants, three of whom were teachers. Allegedly, the defendants knew or should have known that Carneal was plotting the deaths of fellow students, had a duty to take action to prevent Carneal from committing the crimes and breached their duty by failing to warn of Carneal's plan. The additional school employees filed a motion to dismiss the second complaint, again on the basis of sovereign immunity, and the court granted the motion. Another appeal ensued, and the two appeals involving the school employees were consolidated.

The only issue for determination is whether the claims articulated in the complaints against the school employees are barred by the doctrines of sovereign, governmental and/or official immunity. As a preliminary matter, we refer the reader to our previous discussion relating to the applicable standard of review and reiterate that it has been adhered to during the analysis of this issue. However, it is apparent that the underlying premise of the allegations against the school appellees is that the school as an entity should be imputed with collective knowledge of the various "warning signals" which culminated in Carneal's attack on his fellow stu-

---

**80.** Underwood & Weissenberger, *Kentucky Evidence 2003 Courtroom Manual*, p. 409 (2002).

**81.** Ky., 957 S.W.2d 195 (1997) (overruled in part by *Yanero v. Davis*, infra, n. 85).

**82.** Ky., 939 S.W.2d 340 (1997).

dents. Because the school is not a party to this action and is immune from liability in any event, such a theory is legally invalid. The Supreme Court has said that: "The determination of whether an entity is entitled to protection by the constitutional principle of sovereign immunity is for the judiciary."[83] In accordance with this authority, we undertake to resolve the legal question presented.

In *Clevinger v. Board of Education of Pike County*,[84] the Kentucky Supreme Court confirmed that local school boards are agencies of state government and thus are shielded from civil liability under the principles of sovereign immunity when it held that a school board was immune from an action for monetary damages stemming from violation of a statute. In so doing, the Court noted that: "At least since 1941 this Court has recognized that a County Board of Education is an arm of state government, and as such enjoys state sovereign immunity against liability and tort."[85] This principle was reaffirmed by the Court in its most recent decision on the subject, *Yanero v. Davis*,[86] which is dispositive of the issues presented for our consideration.

Ryan Yanero was injured when struck in the head by a baseball thrown by a fellow junior varsity baseball team member during batting practice inside the school gymnasium prior to a scheduled game against another team.[87] When struck, Yanero, who was not wearing a batting helmet, was inside a batting cage attempting to hit pitches thrown by his teammate.[88] In his complaint, Yanero alleged that the board of education, the athletic director and his coaches had negligently failed to require him to wear a batting helmet while engaged in batting practice and/or to administer or obtain appropriate medical treatment as soon as practicable following his injury, that the Board and the Kentucky High School Athletic Association (KHSAA) were negligent in failing to "develop, implement and enforce rules and regulations" pertaining to the proper hiring and training of qualified coaches and athletic directors and/or regarding the proper medical procedures to be followed in the case of a head injury, and, finally, that the Board and the KHSAA were vicariously liable for the negligence of the athletic director and the coaches.[89] As the basis for granting summary judgment to all of the defendants was sovereign, governmental or official immunity, the Supreme Court granted discretionary review for the purpose of clarifying the nature and extent of immunity from tort liability afforded to governmental agencies, officers and employees.

Citing its landmark decision in *Rose v. Council for Better Education, Inc.*,[90] the Court in *Yanero* indicated that any question about the status of a local school board as an agency of state government, to the extent there had ever been one, had been conclusively resolved.[91] Particularly relevant for present purposes, the Court also addressed the argument that Section 231 of the Kentucky Constitution should not bar an action in light of the fact that

---

83. *Id.* at 342.

84. Ky., 789 S.W.2d 5, 11 (1990).

85. *Id.* at 10.

86. Ky., 65 S.W.3d 510 (2001).

87. *Id.* at 517.

88. *Id.*

89. *Id.*

90. Ky., 790 S.W.2d 186 (1989).

91. *Yanero, supra,* n. 85, at 526 (citation omitted).

Sections 2, 14 and 26 of the same constitution afford a remedy for every injury.[92]

In *Yanero,* the Supreme Court reaffirmed the observation made in *Clevinger* that public schools are the responsibility of the state and reiterated that "the General Assembly has established the Kentucky Board of Education, KRS 156.070, and the local school boards, KRS 160.160, as agencies through which it implements its constitutional mandate"[93] to provide "an efficient system of common schools" and maintain it in a constitutional manner.[94] Departing from precedent, however, the Court said that the type of protection afforded to local boards of education is properly classified as governmental immunity (which is the public policy stemming from sovereign immunity that limits the imposition of tort liability on a government agency) rather than sovereign immunity, since a board is an agency of state government as opposed to actually being a "government."[95] Such a distinction has crucial implications as the question of whether a county board of education is subject to tort liability in a given case hinges on a determination of whether it was performing a governmental function or a proprietary function.[96] Further elaboration as to this issue is unnecessary as the preceding discussion is offered solely in an effort to provide context since the appellants here sued only individual board members, administrators and teachers.

A distinct but related concept derived from the principles of sovereign immunity is the doctrine of official immunity which provides protection from tort liability to "public officers and employees for acts performed in the exercise of their discretionary functions."[97] It is the nature of the function performed, not the status or title of the officer or employee which determines whether official immunity applies.[98] After distinguishing between the concepts of sovereign and governmental immunity, the Court in *Yanero* proceeded to analyze whether the coaches were protected by official immunity, noting that the action against them was essentially one for negligent supervision.[99]

Official immunity can be absolute, as when an officer or employee of the state is sued in his representative capacity, in which case his actions are encompassed by sovereign immunity.[100] Similarly, when an employee or officer of a governmental agency is sued in his representative capacity, his actions are afforded immunity coextensive with that of the agency.[101] However, a different situation is presented when public officers and employees are sued in their individual capacities as is the case here. When that occurs, the officers and employees enjoy only qualified official immunity, "which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment."[102]

In *Thompson v. Huecker,*[103] this Court

92. *Clevinger, supra,* n. 83, at 11.

93. *Yanero, supra,* n. 85, at 527.

94. *Id.* at 526.

95. *Id.* at 527.

96. *Id.*

97. *Id.* at 521.

98. *Id.*

99. *Id.* at 527.

100. *Id.* at 521.

101. *Id.* at 522.

102. *Id.*

103. Ky.App., 559 S.W.2d 488, 496 (1977). The section relied upon by the Court was *Restatement (Second) of Torts* (Tentative Draft No. 19, 1973), which has since been amended.

adopted the approach taken by the *Restatement (Second ) of Torts,* Section 895D. Under that section, the court is required to consider not only whether the particular activity should be characterized as a discretionary function, but also the degree of immunity or privilege afforded the officer.[104] Such reasoning remains valid as it is consistent with *Yanero* wherein the Court references the current version of Section 895D when defining the instances where qualified official immunity applies as those involving, "... the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.,* those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." [105]

■ Conversely, an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.,* one requiring only obedience to the orders of others, or when the officer's duty is absolute, certain and imperative, involving merely execution of a specific act arising from fixed and designated facts.[106]

■ The good faith qualification to official immunity for discretionary acts was first recognized by this Court in *Thompson v. Huecker,* and the United States Supreme Court has concluded that the good faith component consists of both an objective and a subjective aspect.[107] The objective component refers to the presumptive knowledge of and respect for unquestioned rights while the subjective component alludes to the presence of a malicious intent or corrupt motive.[108] In the context of qualified official immunity, "bad faith" can be predicated on a violation of a "constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.,* objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." [109] Once the officer or employee has presented a *prima facie* case establishing that the act performed was within the scope of his discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.[110]

In resolving the issue of whether the members of a fiscal court could be liable for negligently failing to establish adequate rules to provide for the safety of a prisoner who committed suicide, the Court in *Malone* quoted its description of the distinction between ministerial and discretionary functions:

"Discretionary or judicial duties are such as necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one of two or more ways, either of which

---

104. *Id.* at 496.

105. *Yanero, supra,* n. 85, at 522 (citations omitted).

106. *Malone, supra,* n. 80, at 201.

107. *See Yanero, supra,* n. 85, at 523 (citations omitted).

108. *Id.*

109. *Id.*

110. *Id.*

would be lawful and where it is left to the will or judgment of the performer to determine in which way it shall be performed. However, an act is not necessarily taken out of the class styled 'ministerial' because the officer performing it is vested with a discretion respecting the means or method to be employed." [111]

The Court, in applying its holding to the specific facts of the case, concluded that the decision as to whether to enact rules to provide for the safe treatment of prisoners necessarily involves discretionary policy determinations and, consequently, is a discretionary function which entitles the members of the fiscal court to complete immunity in the absence of a claim of unconstitutional or illegal conduct. [112] In doing so, the Court left no doubt as to the existence of official immunity under the specific circumstances presented.

 In the present case, the appellants seek to impose liability on the school employees for negligently failing to implement sufficient safety measures to protect the student body. Under the precepts of *Malone* and *Yanero*, the enactment of safety rules is a discretionary function for which the school employees cannot be held liable due to their qualified official immunity. In *Yanero*, the Court determined that the athletic director was entitled to qualified official immunity with regard to the performance of that inherently discretionary function since, as is the case here, there was no basis for concluding that his failure to promulgate a written rule requiring student athletes to wear batting helmets during baseball practice "violated any

constitutional, statutory, or other clearly established right applicable to Yanero, or amounted to a willful or malicious intent to harm Yanero, or was the product of a corrupt motive" [113] as required for a finding of liability. The Court confirmed that the promulgation of such a rule is a discretionary function while the enforcement of it is a ministerial function. [114]

In *Malone*, the Court explained that discretionary acts involve policymaking decisions and significant judgment while those acts properly classified as ministerial are merely routine duties. [115] The apparent basis for this distinction is that a failure to provide immunity for discretionary acts would jeopardize the free operation of government, while, on the other hand, granting immunity for ministerial duties would deny private citizens the right to compensation when they suffer loss due to the failure of public servants to competently perform their duties. In *Yanero*, the Court observed that since *Malone*, it has continued to recognize the distinction between discretionary and ministerial acts, holding that the officer or employee can be subjected to liability for the wrongful performance of a ministerial act. [116] The Court emphasized that, historically, public employees have been subject to tort liability for the negligent performance or non-performance of ministerial duties. [117]

In concluding that the negligence of the coaches was a matter to be decided by a properly instructed jury in accordance with KRS 411.182, the *Yanero* Court made an observation of particular significance to this case when it said that teachers as-

---

111. *Malone, supra,* n. 80, at 201 (*quoting Upchurch v. Clinton County,* Ky., 330 S.W.2d 428, 430 (1959)).

112. *Id.*

113. *Yanero, supra,* n. 85, at 529.

114. *Id.*

115. *Malone, supra,* n. 80, at 202.

116. *Yanero, supra,* n. 85, at 523.

117. *Id.* at 522.

signed to supervise juveniles during school-sponsored curricular or extracurricular activities have a duty to exercise that degree of care exercised by ordinarily prudent teachers or coaches engaged in the supervision of students of comparable age to the plaintiff would exercise under similar circumstances.[118] The rationale for establishing such a duty is that "the protective custody of teachers is mandatorily substituted for that of the parent." [119]

The Court went on to conclude that the performance of that duty in the instance at issue was a ministerial rather than a discretionary function as it involved only the enforcement of a known rule requiring student athletes to wear a helmet during batting practice.[120] Finally, the Court said, Yanero's cause of action was not barred by his own negligence or that of his teammate given that "[t]he very adventuresome nature of teenagers leads to experimentation and should place a teacher on notice that he can look forward not only to the expected but also to the unexpected." [121]

Guided by the foregoing legal background, the remaining allegations against the school appellees must now be analyzed. The specific contentions are set forth below:

30. Defendant school board, administrators, and employees failed to implement any security measures that would have prevented the deaths of Kayce, Nicole and Jessica, failed to take any action on the many warning signals given by Michael Carneal prior to the shootings, and failed to intercept Michael Carneal on the day of the shootings.

118. *Id.* at 529.

119. *Id.*

120. *Id.*

121. *Id.*

* * *

42. ... A teacher, Roger Hayes, noticed that Carneal was carrying the rolled blanket, and asked Carneal what he had. Carneal replied that he had his "English project."

* * *

57. Apparently, Michael Carneal received a passing grade for [Halloween Surprise]. His teacher never notified anyone of Michael's violent and grotesque story.[122]

58. In the fall of 1997, Michael Carneal wrote a story in which he throws an M–80 [a large firecracker] at a judge. He also expressed continued hostility toward preps. Michael Carneal apparently received a passing grade again, and nothing was done.

59. Assistant principal Barbara W. McGinty confiscated "Anarchist Cookbook[ ]" from Michael Carneal. Michael had been selling sections of the book for $1.00 per page. Assistant Principal Barbara W. McGinty failed to recognize and act upon the warning sign.

60. Another teacher permitted a column in the student newspaper entitled "Rumor Has It" to be printed. The article stated that "Michael C. and Adam A. have feelings for each other." Carneal was continuously ridiculed for being gay after publication of the column.

61. Michael Carneal was disciplined for fighting with other students and bringing weapons (numbchucks) to school.

122. The story referred to was written by Carneal in the 8th grade at a middle school, not at Heath High School, and centered around two brothers who *sought revenge against* a group of students called "preps."

62. Michael Carneal was disciplined for accessing the Playboy website from a school computer.

63. Michael Carneal was disciplined for bringing an ice pick to school and stabbing the wall.

64. Michael Carneal was disciplined for stealing a can of applesauce at school.

65. Defendant, Pam Wrinkle, questioned Michael about a self-inflicted wound on his arm. Although she did not believe Michael's story about a bike wreck, she did not notify anyone.

* * *

83. Defendant school system, board, administrators and employees negligently failed to implement any safety measures to properly protect the student body, and negligently failed to detect and prevent the shootings. They also failed to take any action on Carneal's many disciplinary problems.

84. Defendant teachers failed to notify either school officials or John and Ann Carneal that Michael Carneal was writing extremely violent and gruesome stories for class assignments that dealt with the death of classmates and the taking over of the school by force. Such intervention and notification would have prevented the deaths of the Plaintiffs' decedents. They also failed to take any action on Carneal's many disciplinary problems.

The appellants first contend that *Malone* is not applicable because the duties breached by the school appellees involve conduct that is not exclusively within the traditional role of government. This assertion is without merit under the tenets set forth in the preceding analysis. Based on the holding in *Clevinger* as upheld by *Yanero,* public education is unquestionably a traditional role of government, and there is no dispute that the actions of the school appellees were within the scope of their employment. That being the case, the inquiry becomes whether the conduct in question was discretionary in nature and characterized by good faith.

■ At the outset, we observe that even liberally construed, the statements contained in paragraphs 61–64 of the complaint can only be construed as just that, statements, not allegations. They indicate that Carneal was disciplined for fighting, bringing numbchucks to school, accessing the Playboy website from a school computer, stabbing the wall with an icepick and stealing a can of applesauce. If anything, these statements undermine the contention that the school employees disregarded Carneal's delinquent behavior and contradict the claim that the school employees "failed to take any action on Carneal's many disciplinary problems." Presumably, the appellants sought to have the circuit court infer that Carneal's disciplinary problems established a pattern which placed the school appellees on notice that he had violent tendencies. Such an inference is not permissible as there is no allegation that any individual employee was aware of Carneal's entire history and the school as an entity cannot be imputed with such knowledge. Such a determination renders further analysis with respect to the enumerated claims unnecessary.

■ In reference to the allegations against Roger Hayes and Pam Wrinkle, the common thread is that both teachers are faulted for failing to pursue a line of questioning and/or further investigation in light of Carneal's allegedly suspicious responses to their questions regarding what he was concealing in his blanket on the day of the shootings and the source of the wound on his arm, respectively. While these teachers did have a duty to exercise a degree of care commensurate with their positions, the performance of that duty in

this instance was not a ministerial function as the decision whether to approach Carneal initially and the assessment of his explanations necessarily involved the exercise of discretion and judgment. Under *Yanero,* Hayes and Wrinkle are entitled to official immunity for their discretionary acts subject to the good faith qualification. Their qualified immunity can only be defeated if they knew or reasonably should have known that their actions, performed within the sphere of their official responsibility, would violate the appellants' constitutional rights or if they were motivated by a malicious intent to cause a deprivation of such rights or other injury.[123] There is no allegation that such knowledge or intent existed here, and no credible argument can be made that either Hayes or Wrinkle could *reasonably* have anticipated that their inaction would contribute to such horrific consequences. Under any set of facts that could be proved, neither Hayes nor Wrinkle acted in bad faith.

■ With respect to the allegation that assistant principal McGinty "failed to recognize and act upon the warning sign" when she confiscated the *Anarchist Cookbook* from Carneal, the preceding analysis is equally dispositive. We assume *arguendo* that the subject matter of that publication is a disturbing departure from the type of material an assistant principal might expect to discover in a student's possession. However, McGinty exercised her discretion when determining an appropriate punishment for a specific offense and apparently felt that seizure of the item was a sufficient response. When viewed in isolation, we cannot conclude that this incident was characterized by bad faith as defined in *Yanero.*

■ Allegedly, Carneal's teachers were negligent because they gave him a passing grade for a story in which he throws an M–80 at a judge, "Halloween Surprise" and other "extremely violent and gruesome stories" written for class assignments which depicted the death of classmates as well as the commandeering of the school. Supposedly, if the teachers had notified Carneal's parents and/or school officials that he was submitting such troubling portrayals rather than continuing to pass him, the death of Carneal's victims could have been prevented. No task is more fundamental to teaching or inherently discretionary than evaluating assignments and deciding whether the content is sufficiently alarming to warrant additional review by parents and/or officials. In the absence of an allegation that the teachers knowingly violated the victims' protected rights, maliciously intended to harm the victims or acted with a corrupt motive toward them, the appellants cannot establish that the teachers exhibited bad faith.

■ According to the appellants, another teacher was negligent for permitting a column entitled "Rumor Has It" to appear in the school newspaper. Allegedly, Carneal was ridiculed for being gay following publication of the column because it contained an allegation that he and another boy "had feelings for each other." Assuming *arguendo* that the teacher was responsible for screening articles submitted for publication, such a function is defined by the exercise of personal judgment, deliberation and decision. Again, no set of facts could be proved which would support a claim that this unidentified teacher acted with the requisite bad faith. Therefore, he/she is immune from liability for these official, discretionary actions.

■ Any of the conduct engaged in by the teachers, administrators and Board members can be properly classified as dis-

---

**123.** *Yanero, supra,* n. 85, at 523.

cretionary as they personify the type of acts which are intended to receive protection. Without such protection, the ability of those entrusted with the education of our children to perform the varied functions fundamental to their employment would be hindered. The conduct exhibited by the school appellees inherently required conscious evaluation of alternatives, personal reflection and significant judgment. By definition, their actions were discretionary. In this circumstance, their judgment may arguably be questionable, particularly with the benefit of hindsight, but applying such an unrealistic standard is not only unjust, it's unauthorized.

There is no allegation that known rights were violated or that malice and/or corruption was responsible for the conduct engaged in by the school personnel. Consequently, neither their actions nor their inaction resulted from bad faith, in the objective or subjective sense. To the degree that the allegations at issue identify specific individuals and claims rather than make generalized contentions, they are not remotely similar to a situation where the ministerial task of enforcing a known rule, i.e., wearing a batting helmet, is the basis for finding liability. No parallel can be drawn.

A review of the complaint reveals the essence of the appellants' argument. Implicitly, they are seeking to impute to the school as an entity knowledge of the sequence of events which preceded the tragedy. While the cumulative effect of the incidents in question is undoubtedly disturbing and disregard of such a warning might very well have constituted an example of bad faith, it is equally evident, as earlier pointed out, that the school itself is protected from liability by sovereign immunity and each individual can only be held accountable for responding in a manner consistent with that of an "ordinarily prudent" teacher or supervisor to those occurrences of which he or she was aware or should have been aware at the time. When viewed in isolation, none of these events serve as "warning signals" of a propensity for the type of violence which culminated in the death of three students and the injury of several others. Carneal's actions go well beyond the "unexpected." To hold otherwise would require a leap of logic, be contrary to governing law and compound the impact of the tragedy. Assuming that the allegations against the school employees are true in their entirety, no credible argument can be made that the discretionary actions were taken in bad faith.

As pointed out in *Malone*, "[t]he essence of a discretionary power is that the person or persons exercising it may choose which of several courses will be followed. The power to exercise an honest discretion necessarily includes the power to make an honest mistake of judgment."[124] If the ultimate injuries were not foreseeable by the governmental officials in their individual capacity and the victim was not identifiable, the Supreme Court has said, no duty exists to prevent such an injury.[125] In accordance with the rationale set forth in *Malone* and *Yanero*, all of the school employees are immune from liability for the appellants' damages.

### Conclusion

As explained in detail above, the appellants are not entitled to relief from any of the numerous appellees, either because no legally cognizable claim upon which relief may be granted has been alleged or no evidence has been proffered which raises a

---

124. *Malone, supra,* n. 80, at 201 (citations omitted).

125. *Fryman v. Harrison,* Ky., 896 S.W.2d 908, 909 (1995).

genuine issue of material fact justifying a trial on the merits. Therefore, the several McCracken Circuit Court judgments dismissing the complaints against all appellees are affirmed.

GUIDUGLI, Judge, CONCURS.

JOHNSON, Judge, CONCURS IN PART, CONCURS IN RESULT ONLY IN PART, DISSENTS IN PART AND FILES SEPARATE OPINION.

JOHNSON, Judge, CONCURRING IN PART, CONCURRING IN RESULT ONLY IN PART AND DISSENTING IN PART.

I concur with the Majority Opinion except for two issues. As to the dismissal of the appellants' claims against Alan Coleman, Jeremy Ellis, Matthew Barnett, Michael Alonso, James O'Nan and Toby Nace, I respectfully dissent. I believe there is a genuine issue as to a material fact concerning whether each of these students knew that Carneal intended to shoot someone at Heath High School on or about December 1, 1997, and whether each student either gave substantial assistance to Carneal or encouraged him to shoot people at the school. As to the dismissal of the appellants' claims against the school teachers as individuals, I concur with the result of the dismissal. However, I choose to write separately concerning the applicability of official immunity to these teachers.

I will first address the dismissal of the claims against the six students who allegedly conspired with Carneal to carry out the school shootings. The Majority Opinion correctly sets forth various aspects of the law related to the appellants' claims against these students, but I believe further discussion is helpful to gain a clearer understanding of this area of the law. None of the cases cited by the Majority in its discussion of civil conspiracy involve a claim against an aider and abetter for his conduct in assisting or encouraging another person to commit an assault [126] and/or battery.[127]

The appellants' cause of action is far from novel; it has been recognized for centuries.[128] In Kentucky, as early as 1821 the former Court of Appeals in *Metcalfe v. Conner*,[129] discussed the appropriate jury instructions in "an action of trespass, assault and battery" where the plaintiff alleged that a group of defendants "seized him, wrested the axe from him, and forced him out of the door; that some of the defendants, while they were out of the house, took him by the collar and choked him, and that others had him by the arms, holding them behind him."[130] The Court reversed the trial verdict due to various errors in the instructions including the instructions' failure to provide that "the intention with

---

126. "[A]n assault is a demonstration of an unlawful intent by one person to inflict immediate injury or offensive contact on the person of another then present." 6 Am.Jur.2d *Assault and Battery* § 1, p. 10 (1999).

127. "A battery is a wrongful or offensive physical contact with another through the intentional contact by the tortfeasor and without the consent of the victim, the unpermitted application of trauma by one person upon the body of another person." 6 Am.Jur.2d *Assault and Battery* § 3, p. 13 (1999).

128. The torts of assault, battery and false imprisonment have been "designated as 'classic' intentional torts because they are of ancient origin and, in modern times, are routinely categorized in texts and case books as intentional torts." Kenneth J. Vandevelde, *A History of Prima Facie Tort: The Origins of a General Theory o f Intentional Tort*, 19 Hofstra L.Rev. 447, 450, n. 16 (1990).

129. 16 Ky. 370 (1821).

130. *Id.* at 371.

which to act is done [is not a] matter of law to be decided by the court, but [a] matter of fact to be left to the jury." [131] In *Sodusky v. McGee*,[132] the Court of Appeals affirmed a judgment for damages "in an action of assault and battery" against multiple defendants where "there was evidence tending to prove that a combined and preconcerted attack was made on the [plaintiff]." [133] The Court ruled that the trial court's "instructions are all conformable to the law." Among those instructions was an instruction "that all the appellants, who counseled, abetted or *arranged*[134] in producing the assault, were equally guilty with those who struck" [emphasis original].[135] In *Bird v. Lynn*,[136] the Court of Appeals reversed a jury verdict in an "action of trespass, assault and battery" against three defendants on the basis of improper jury instructions. In remanding the case for a new trial, the Court of Appeals stated that the plaintiff must prove that the defendants "knowingly and intentionally encouraged the trespass[.]" [137] In *Ryan v. Quinn*,[138] the Court of Appeals reversed a jury verdict in favor of the plaintiff in an action for assault and battery which alleged that various defendants "had previously combined and conspired with the other defendants, and aided and abetted them by re-

maining in the presence when the assault was committed, and protecting the other defendants from interference while committing the assault." [139] In reversing and remanding for a new trial, the Court of Appeals held one of the jury instructions to be "erroneous in using the word 'approved' ".[140] The Court stated:

> If Ryan incited, procured, or encouraged the other men to beat Quinn, he is responsible; but he is not responsible because in his heart he may have approved of it. A man is not responsible for a beating inflicted by another because he thinks the punishment deserved, or is secretly pleased to see it go on. He is only responsible when he incites or procures it, or aids in its commission. *Blue v. Christ*, 4 Ill.App. 851[351]; *Lister v. McKee*, 79 Ill.App. 210; *Himes[Hilmes] v. Stroebel*, 59 Wis. 74, 17 N.W. 539; *True v. Com.*, 90 Ky. 651, 14 S.W. 684; *Omer v. Com.*, 95 Ky. 353, 25 S.W. 594.

In *Eustler v. Hughes*,[141] a case alleging conspiracy to commit arson, the Court of Appeals stated:

> A conspiracy to accomplish an unlawful purpose is proved more often than otherwise by forging a chain of isolated statements or acts of the conspirators

**131.** *Id.* at 372.

**132.** 28 Ky. 621 (1831).

**133.** *Id.* at 621.

**134.** *Id.* at 626.

**135.** The Court stated:
The only objection which has been made to them is, that the word *arranged* in the last was improper and delusive.
It was certainly inappropriate; but used, as it was, in connection with the other expressions, and with the facts proved, its import was clear, and its effect could not have been illegal or delusive [emphasis original].

**136.** 49 Ky. 422 (1850).

**137.** Trespass is used here broadly to include the "[d]oing of unlawful act or of lawful act in an unlawful manner to injury of another's person or property." Black's Law Dictionary p. 1674 (4th ed.1968).

**138.** 71 S.W. 872 (1903).

**139.** *Id.* at 873.

**140.** *Id.* at 876.

**141.** 267 Ky. 200, 101 S.W.2d 917 (1937).

which of themselves would establish nothing culpatory. It is proving the charge by circumstances from which the joint assent of the minds of two or more of the parties to the unlawful enterprise may be reasonably inferred. *Addison v. Wilson*, 238 Ky. 143, 37 S.W.2d 7 [1931].

In *Addison, supra*, a case alleging fraud and misrepresentation, the Court of Appeals stated:

A conspiracy may be shown by circumstantial evidence, by the acts or declarations of the conspirators, or by the cumulative effect of concerted action of the several parties concerned. 5 R.C.L., sec. 53, p. 1103; 12 C.J. sec. 231, p. 638.

In *State v. Ripley*, 31 Me. 386, it was said:

"It is often, that the intentions of a wrongdoer are ascertained entirely by acts done, which are the natural effects of unlawful designs; the acts and circumstances which accompany them, showing the connection between the acts, and the motives which produced them, are generally the most convincing evidence which can be adduced."

When individuals associate themselves together in an unlawful enterprise, any act done in pursuance of the conspiracy by any of the conspirators is in legal contemplation the act of all. *Metcalfe v. Conner*, Litt.Sel.Cas. 497, 12 Am. Dec. 340[, 16 Ky. 497].

The mind of each being intent upon a common object and the energy of each being enlisted in a common purpose, each is the agent of all the others, and the acts done and words spoken during the existence of the enterprise are therefore the acts and words of each and all. *Commonwealth v. Campbell*, 7 Allen ([89]Mass.) 541, 83 Am. Dec. 705; *U.S. v. Gooding*, 12 Wheat., 460, 6 L.Ed. 693; *Nudd v. Burrows*, 91 U.S. 426, 23 L.Ed. 286; *Logan v. U.S.*, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429; *Page v. Parker*, 43 N.H. 363, 80 Am. Dec. 172.[142]

Thus, under established Kentucky case law a person is liable for the damages suffered by a tort victim if he knowingly aids [143] or abets [144] another person in committing the tort. This doctrine of law is uniformly accepted across the United States.[145]

142. *Id.* at 152.

143. "Aid" is "[t]o support, help, assist or strengthen." *Black's Law Dictionary* p. 91 (4th ed.1968).

144. "Abet" is "[t]o encourage, incite . . . command, procure, or counsel[.]" *Black's Law Dictionary* p. 17 (4th ed.1968).

145. Just a few of the cases from other jurisdictions addressing this issue include:
(1) *Brown v. Perkins*, 83 Mass. 89, 1 Allen 89 (1861) cited in *Hilmes v. Stroebel*, 59 Wis. 74, 17 N.W. 539 (1883),
"Any person who is present at the commission of a trespass, encouraging or exciting the same by words, gestures, looks, or signs, or who in any way or by any means countenances or approves the same, is in law deemed to be an aider and abettor, and liable as principal; and proof that a person is present at the commission of a trespass,

without disapproving or opposing it, is evidence from which, in connection with other circumstances, it is competent for the jury to infer that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same."
(2) *Rush v. Farmerville*, 156 La. 857, 101 So. 243 (1924) (citing *Kernan v. Humble*, 51 La. Ann. 389, 25 So. 431 (1899)),
When a tort is perpetrated through the instrumentality of a combination or conspiracy, the party wronged and injured may look beyond the actual participants in committing the injury, and join with them, as defendants, all who co-operated in, advised, or assisted in the accomplishment of the common design, for cotrespassers are bound in solido.
(3) *Francis v. Kane*, Tex.App., 246 S.W.2d 279 (1951),
In the case of *Walker v. Kellar*, Tex.Civ.App., 226 S.W. 796, 800, writ refused, the court

As stated at 6 Am.Jur.2d *Assault and Battery* § 108, p. 93 (1999): "Civil liability for assault and battery is not limited to the direct perpetrator of the act charged; it extends to any person who by any means encourages or incites the act or aids and abets it. . . . In order to hold a defendant liable for another's act of shooting the plaintiff, the factfinder must find that the defendant knew, or should reasonably have known, that the other person intended to commit the act. A finding that a defendant acted in concert with a companion can be supported by circumstantial evidence."

I will now review the record below to determine whether the appellants have presented sufficient evidence to defeat the appellee's motion for summary judgment. The bulk of the evidence relied upon by the appellants to support their tort claims against the co-conspirators is in the form of statements made by Michael Carneal to Mark Hayden, a McCracken County Depu-

---

held that in order for a person to be liable for damages as a principal in an unlawful assault, "He must have given aid or encouragement of some kind to the actual participants." 52 Am.Jur. 450, paragraph 111, says in part: "On the theory that the act of one is the act of all, the rule of joint and several liability of tort-feasors prevails where the tort-feasors act in concert or unit of action." The same volume, page 454, paragraph 114, further says: "One who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another has been regarded as being as responsible as the one who commits the act, so as to impose liability upon the former to the same extent as if he had performed the act himself."

(4) *Keel v. Hainline,* Okla., 331 P.2d 397 (1958),

It is immaterial whether defendant Keel aided, abetted or encouraged defendant Jennings in throwing the eraser in such a manner as to injure Burge, or not, since it is virtually undisputed that defendant Keel aided, abetted or encouraged the wrongful activity of throwing wooden erasers at other persons, which resulted in the injury to Burge. In this connection *see Selby v. Lindstrom,* 59 Okl. 227, 158 P. 1127; *Williams v. Townsend,* 15 Kan. 563, 27 Pac.States Rep. 424; 4 Am.Jur. 127, *Assault and Battery,* sec. 4; 52 Am.Jur. 455, *Torts,* sec. 116.

(5) *Ayer v. Robinson,* 163 Cal.App.2d 424, 329 P.2d 546 (1958),

A party injured by an unjustified assault may recover damages not only from the actual assailant, but from any other person who aids, abets, counsels or encourages the assault. (*Turner v. Whittel,* 2 Cal.App.2d 585, 589 [38 P.2d 835]; *Boyajian v. Balian,* 7 Cal.App.2d 174, 176 [46 P.2d 199].) Whether appellant aided and abetted his son in administering a severe beating to plaintiff was a question of fact to be resolved by the court. Although the evidence was in conflict, the court could conclude from the testimony of plaintiff and his witnesses that appellant urged and encouraged his son to attack plaintiff. This testimony if believed, sufficiently supports the challenged finding.

(6) *Restatement (Second) of Torts* § 876, Comment on Clause (b):

d. Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.

. . .

The assistance of or participation by the defendant may be so slight that he is not liable for the act of the other. In determining this, the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered. (See Illustration 9). Likewise, although a person who encourages another to commit a tortious act may be responsible for other acts by the other (see Illustration 10), ordinarily he is not liable for other acts that, although done in connection with the intended tortious act, were not foreseeable by him. (See Illustration 11). In determining liability, the factors are the same as those used in determining the existence of legal causa-

ty Sheriff, Dr. Dewey G. Cornell, a clinical and forensic psychologist, and Dr. Diane Schetky, a board certified forensic psychiatrist. The Majority has held that these various statements by Michael Carneal are hearsay and are not admissible under any exception to the hearsay rule. While the appellants have failed to argue the one exception that clearly applies, for the purpose of summary judgment, we must evaluate the evidence under the correct rules of law. Since this case has not gone to trial but is before us on a summary judgment, our standard of review requires us to determine whether the appellees were entitled to summary judgment as a matter of law. Obviously, that standard requires the application of the correct law which we must assume the trial court would apply at an actual trial.

The applicable rule of evidence, which is not discussed by the trial court, the parties or the Majority Opinion, is KRE 801A(a)(1). This rule of evidence provides that "[a] statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is . . . [i]nconsistent with the declarant's testimony." This rule of evidence codified the landmark ruling by the former Court of Appeals in *Jett v. Commonwealth.*[146] As Professor Lawson writes: "The legislative history of KRE 801A(a)(1) leaves no doubt that the intent of the General Assembly and Supreme Court was to codify the *Jett* Rule as it had developed in the case law."[147] The *"Jett* Rule" "held that prior inconsistent state-

ments may be used for substantive as well as impeachment purposes, and thereby created an important new exception to the hearsay rule."[148] In *Grider Hill Dock, Inc. v. Sloan,*[149] the *Jett* Rule was extended to civil cases; and in *Wise v. Commonwealth,*[150] it was applied to a "forgetful" witness.

In *Wise,* two women, who were friends of the defendant, had given police statements which implicated Wise in two assaults. At trial, the two women claimed to have had a lapse of memory. This Court noted that the two women were "obviously hostile witnesses[,]" and that "the sum of the testimony presented by them at trial was, 'I don't remember.'" In affirming the trial court's admission of the two witnesses' prior inconsistent statements as substantive evidence, this Court stated "that when a witness has testified about some of the facts in a case, the jury is entitled to know what else the witness has said about the case, so long as it is relevant to the merits of the case as distinguished from mere collateral issues." This Court reiterated the rule of evidence from *Jett* "that any out-of-court statement made by a witness which is material and relevant to the issues in the case may be received as substantive evidence through testimony of another witness."[151]

Professor Lawson in his highly respected treatise points out that "[i]t is clear that the *Jett* exception requires neither a written record of the prior statement nor an admission by the declarant that the statement was made; in fact, the prior inconsistent statement in *Jett* itself was oral and was disavowed by the declarant from the

tion when there has been negligence (see § 442) or recklessness. (See § 501).

**146.** Ky., 436 S.W.2d 788 (1969).

**147.** Lawson, *The Kentucky Evidence Law Handbook* § 8.10, p. 373 (3d ed., 1993).

**148.** *Id.*

**149.** Ky., 448 S.W.2d 373 (1969).

**150.** Ky.App., 600 S.W.2d 470 (1978).

**151.** *Id.* at 472.

witness stand." [152] Furthermore, Justice Cooper in writing for our Supreme Court in *Thurman v. Commonwealth,*[153] stated: "Under KRE 801A(a)(1), which codified the holding in *Jett v. Commonwealth, supra,* any prior inconsistent statement of a witness is admissible for substantive purposes. Thus, even if the Commonwealth's 'primary purpose' in calling Loretta Smith as a witness had been to impeach her with her prior inconsistent statements, the evidence contained in those statements was not 'otherwise inadmissible'".

In *Di Carlo v. United States,*[154] an often-cited opinion involving the admissibility of prior inconsistent, out-of-court statements made by a witness, Judge Learned Hand eloquently wrote:

> [Gilmore] told the same story as Pattitucci up to the point of the attack, when as we have said she declared that she could not identify the defendants. The prosecution, plainly surprised by this volte face, then began to cross-examine her straitly, and brought out from her contradictory statements, made not only before the grand jury, but on other occasions. Her actual evidence before the grand jury was not introduced. The latitude to be allowed in the examination of a witness, who has been called and proves recalcitrant, is wholly within the discretion of the trial judge. Nothing is more unfair than to confine a party under such circumstances to neutral questions. Not only may the questions extend to cross-examination, but, if necessary to bring out the truth, it is entirely proper to inquire of such a witness whether he has not made contradictory statements as other times. He is present before the jury, and they may gather the truth from his whole conduct of contradictory answers he may have made at other times.

> The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court [citations omitted].

In summary, under the *Jett* Rule, as codified at KRE 801A(a)(1), the appellants may call Michael Carneal as a witness; and pursuant to KRE 613, they may ask him about any prior inconsistent statements he has made that are relevant to the school shootings. Furthermore, the appellants may call as a witness any person to whom Michael Carneal has made a prior, inconsistent statement that is relevant to the school shootings. To the extent they are relevant, these out-of-court, prior inconsistent statements must be admitted into evidence by the trial court as substantive evidence in support of the appellants' claims.[155]

---

**152.** *The Kentucky Evidence Law Handbook* at 375–76.

**153.** Ky., 975 S.W.2d 888, 893–94 (1998).

**154.** 6 F.2d 364, 367–68 (2nd Cir.1925) *cert. denied,* 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925).

**155.** Any argument that these prior inconsistent statements by Carneal are inadmissible because they fail to meet the requirements of KRE 801A(b)(5), concerning a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy, is misplaced. The prior inconsistent statement exception to the hearsay rule as provided for at KRE 801A(a)(1) is a separate rule of evidence and is not dependent upon any qualifying requirements under KRE 801A(b)(5). As our Supreme Court noted in *Thurman, supra,*

Once these numerous prior inconsistent statements by Michael Carneal are considered as substantive evidence, I believe it is clear that the trial court erred by dismissing the appellants' tort claims against the alleged co-conspirators by granting summary judgments. There are many genuine issues as to material facts which make summary judgment on these claims improper. In the interest of brevity, I will list only some of these factual disputes.

On December 4, 1997, when Deputy Hayden was transporting Carneal back to the detention facility following an interview with law enforcement authorities, Carneal talked to Deputy Hayden about the school shootings. On December 5, 1997, Deputy Hayden prepared a written report concerning what Carneal had told him. On September 20, 1999, Deputy Hayden gave a deposition in this case and confirmed his written report. Some of the statements that Carneal made to Deputy Hayden which would be admissible as prior inconsistent statements and which raise genuine issues of material fact include: (1) whether Michael Carneal, Toby Nace, James O'Nan, Matthew Barnett, Michael Alonso, and another boy whose name Deputy Hayden did not know, planned on Wednesday, November 26, 1997, the day before the Thanksgiving school break, to carry out the shootings at Heath High School on Monday, December 1, 1997; (2) whether the school-shooting plan included

"*any* prior inconsistent statement of a witness is admissible for substantive purposes" [emphasis added]. The use of a prior inconsistent statement by a co-conspirator as substantive evidence even when it would not meet the requirements of KRE 801A(b)(5) is well established. *See* Andrea G. Nadel, J.D., Annotation, *Prior Inconsistent Statements As Evidence*, 30 A.L.R.4th 414, 446 (1984); 29 Am. Jur.2d *Evidence* § 831 (1994)("There are alternative methods for the introduction of a statement which is inadmissible under the coconspirator exception. Such a statement may be offered for a nonhearsay use, to impeach the testimony of a coconspirator on the stand as a witness for the defense, on the grounds that the defendant waived the hearsay objection by using hearsay statements otherwise inadmissible under the coconspirator exception during the presentation of his case, under other hearsay exceptions, such as the exception for declarations against interest, or a statement of a declarant's then-existing mental, emotional, and physical condition" [footnotes omitted].); *Rowe v. Farmers Insurance Co., Inc.*, Mo., 699 S.W.2d 423 (1985)(The insurance company refused to pay proceeds to insured because it believed he conspired to commit arson. At trial, the insurance company should have been allowed to cross-examine its own witness, Carroll, and to ask him for substantive evidence purposes whether he had told a police officer that he had overheard the insured tell another man that he was going to burn his car to collect insurance proceeds. The insurance company should have also been allowed to question the police officer about Carroll's prior inconsistent statements.); *Miranda v. State of Nevada*, 101 Nev. 562, 707 P.2d 1121, 1124 (1985)("Although Miranda failed to make this argument either at trial or in his briefs on appeal, to the extent that Fernando's out-of-court statements to police were inconsistent with his trial testimony, they were independently admissible as substantive evidence under NRS 51.035(2)(a), the statutory exception to the hearsay rule which permits the introduction of prior inconsistent statements made by a testifying witness." Fernando was a co-conspirator who had made statements to the police during the murder investigation which led to charges against Miranda.); *Fletcher v. State*, Ind., 442 N.E.2d 990 (1982)(Prior inconsistent, out-of-court statements given to police by two co-conspirators as part of a murder and robbery investigation were admissible as substantive evidence when the two co-conspirators changed their stories at trial.); *People v. Young*, 170 Ill.App.3d 969, 120 Ill.Dec. 800, 524 N.E.2d 982 (1988)(In murder and robbery trial, the prior inconsistent, out-of-court statements by a co-conspirator were admissible as substantive evidence when witness changed his story at trial.); and *Lockhart v. State*, 169 Ga.App. 931, 315 S.E.2d 455 (1984)(In a burglary case, a co-conspirator's prior inconsistent statement given to police as part of the investigation was admissible as substantive evidence).

a plan for Carneal to start shooting so as to cause a distraction so the other boys could pick up their guns and go to their predetermined points; (3) whether on November 26, 1997, Carneal told these five boys that he would take the guns from Nace's house and that "there's enough for all of us"; (4) whether Carneal told these five boys what kinds of guns were available and whether O'Nan requested a shotgun so he could hide it under his trenchcoat because he thought it would be cool to have it under his trenchcoat and to whip it out; (5) whether Carneal told these five boys that he wanted to use a pistol; (6) whether Barnett asked Carneal which gun he was going to get and whether Carneal explained to Barnett how all the guns looked and worked, and whether Barnett then requested the other pistol; (7) whether Nace requested to use a knife; (8) whether Barnett asked Carneal when the school shooting was going to happen and Carneal told him, "Monday is the big day"; (9) whether Nace cooperated with Carneal on November 26, 1997, and showed Carneal the guns they would need for the school shooting at Nace's father's outbuilding and whether Nace showed Carneal where his father hid the key to the gun cabinet; (10) whether Carneal took numerous guns and earplugs to school on December 1, 1997, because the other five boys were supposed to help him with the shooting; (11) whether on the morning of December 1, 1997, in the school's lobby Carneal opened his backpack and showed Barnett a pistol, and whether Barnett asked Carneal if he was going to use it and Carneal replied, "you ain't shittin'"; (12) whether Barnett asked Carneal when the shooting was going to happen and Carneal said it would happen after the prayer group broke up and Barnett said for Carneal to get moving because the group was about finished and Carneal at that point put in his earplugs; (13) whether these five boys were with Carneal when he started shooting, but betrayed him and ran off; (14) whether Carneal lied to the police during some interviews because he did not want to get the other five boys in trouble; and (15) whether O'Nan was Carneal's leader and whether Carneal shot the students because he listened to O'Nan talk about kidnapping and killing babies and because O'Nan was always bugging him about the school shooting.

As part of his defense to the criminal charges brought against him, Michael Carneal hired Dr. Dewey G. Cornell, a clinical and forensic psychologist, to perform a psychological evaluation. Some of the statements that Carneal made to Dr. Cornell which would be admissible as prior inconsistent statements and which raise genuine issues of material fact include: (1) whether Carneal felt like he could never be successful or popular with his peers and turned to a group of students who were regarded as the outcasts or "freaks" of the school, including O'Nan, Barnett, Jeremy Ellis and Alan Coleman; (2) whether O'Nan, Barnett, Ellis and Coleman, who were juniors and seniors and older than the freshman Carneal, had status in the eyes of Carneal; (3) whether O'Nan, who was a rebellious young man who espoused anti-Christian attitudes and claimed to be knowledgeable about occult practices and was feared by some students, was attractive to Carneal because O'Nan had an aura of mystery and power; (4) whether Carneal regarded O'Nan as the leader of his new group of friends and whether he turned to O'Nan as a role model; (5) whether Carneal was eager to please and be accepted by O'Nan, Barnett, Ellis and Coleman and whether he engaged in unconventional and even illegal behavior in order to be accepted; (6) whether O'Nan, Barnett, Ellis and Coleman took advantage of Carneal's vulnerability and manipulated

him by encouraging him to do things for them such as stealing several one hundred dollar bills from his father and giving them stolen money and other stolen property; (7) whether Carneal felt pleased with himself when his illegal actions made a favorable impression on O'Nan, Barnett, Ellis and Coleman and when O'Nan let him wear his trenchcoat at a party; (8) whether O'Nan, Barnett, Ellis, Coleman, Nace and Alonso assisted Carneal in planning the school shootings by discussing various schemes for using guns to take over the school including taking over the school office and firing at students in the hallway; (9) whether during one of the planning discussions Carneal volunteered to obtain the guns for the boys and whether O'Nan, as the leader, accepted Carneal's offer and on several occasions reminded him that he was supposed to obtain the guns for the group of boys; (10) whether Carneal stole his father's handgun, took it to school, showed it to O'Nan for his approval, but the handgun was rejected by O'Nan because he wanted a shotgun; (11) whether Nace tapped on his father's gun cabinet and told Carneal that these guns were the kind they needed to "do the school thing"; (12) whether Carneal stole a handgun and ammunition from Nace's residence on Tuesday, November 25, 1997, and took them to Alonso's residence where Carneal and Alonso shot at a rubber ball for target practice; (13) whether at school on Wednesday, November 26, 1997, Carneal, O'Nan, Barnett and Ellis discussed which gun each boy would use in the school shootings on Monday, December 1, 1997; (14) whether O'Nan told Carneal he wanted to use a shotgun so he could pull it out of his trenchcoat like he had seen a character do in a movie; (15) whether Carneal took some rifles and shotguns he had stolen from Nace's gun cabinet on Thursday, November 27, 1997, Thanksgiving Day, to Alonso's residence and left the guns with

Alonso; (16) whether Carneal felt encouraged by O'Nan and the other boys to bring the various guns to school on December 1, 1997, because they knew he was bringing the guns to school and that he planned to use them for the school shootings; (17) whether Carneal intended and expected to distribute the guns to O'Nan, Ellis, Barnett and Coleman at school on December 1, 1997, to assist him in the school shootings; (18) whether Carneal feels an obligation to protect the other boys, who he considers to be his friends, from getting into trouble and has lied to various authorities about their involvement in the school shootings; (19) whether Carneal found O'Nan's and this group of boys' idea of shooting students and taking over the school compelling; (20) whether Carneal committed the school shootings in order to impress and please O'Nan and the other boys; and (21) whether Carneal was substantially influenced in shooting the students at school by the encouragement and direction of O'Nan, Barnett, Ellis, Coleman, Nace and Alonso.

Michael Carneal was also evaluated for his defense to the criminal charges by Dr. Diana Schetky, a board certified forensic psychiatrist. Some of the statements that Carneal made to Dr. Schetky which would be admissible as prior inconsistent statements and which raise genuine issues of material fact include: (1) whether in committing the school shootings Carneal was easily led and significantly influenced and encouraged by a group of students whose approval he desperately sought and whom he is still trying to protect; (2) whether Nace knew that the latch to the back window of his father's garage, where the guns that Carneal stole were stored, was left unlatched; (3) whether Nace gave Carneal several sets of earplugs before the school shootings; and (4) whether on the morning of December 1, 1997, before the

shootings when Carneal arrived at school with the guns wrapped in a blanket O'Nan made the statement, "Notice the sound when it hits the ground, it sounds like guns."

In addition to these statements by Carneal which support a finding of civil conspiracy in the school shootings, various statements by other witnesses which also raise genuine issues of material fact include: (1) whether Michael Alonso, by accepting delivery from Carneal of three rifles or shotguns and a lunch pail filled with ammunition on Saturday, November 29, 1997, and hiding the weapons in his bedroom, either gave substantial assistance or encouragement to Carneal in carrying out the school shootings; (2) whether Alonso, by assisting Carneal the week before the school shootings in target practice with the .22 caliber pistol that was used in shooting the victims, either gave substantial assistance or encouragement to Carneal in carrying out the school shootings; [156] and (3) whether Toby Nace was standing next to Carneal in the school lobby before the shootings and whether Nace put earplugs in his ears immediately before Carneal began shooting.[157]

Thus, I am of the opinion that the trial court's summary judgment dismissing the appellants' claims against Alan Coleman, Jeremy Ellis, Matthew Barnett, Michael Alonso, James O'Nan and Toby Nace should be reversed as the record reveals many genuine issues of material fact concerning the liability of each of these defendants in aiding and abetting Michael Carneal in carrying out the shootings at Heath High School on December 1, 1997.

As to the appellant's claims against the teachers, I concur in the result of the dismissal, but I cannot accept the Majority Opinion's characterization of the teacher's duties as discretionary. I believe that pursuant to *Yanero* the teachers herein had a duty to exercise that degree of care that an ordinarily prudent teacher engaged in supervision of students of like age would exercise under similar circumstances. Like the coaches in *Yanero*, I believe the performance of that duty herein was a ministerial function, rather than a discretionary function. The ministerial function herein is similar to the ministerial function in *Yanero* in that both involved the enforcement of known rules that were intended for the protection of the students. Obviously, the school had rules prohibiting a student from bringing a weapon to school and from harming another student. I believe pursuant to *Yanero* that under some circumstances a teacher could be held individually liable for his or her negligence in breaching his or her duty to enforce a school rule prohibiting a student from harming another student. However, in this case, I believe the appellants have failed to adequately plead a claim for relief with a sufficient factual basis to support a negligence action against any of the teachers. My position on this issue differs from the Majority Opinion in that the Majority concludes that due to the discretionary nature of the teachers' actions that they owed no duty to the injured students; I conclude that the teachers' actions were ministerial in nature and thus they owed the injured students a duty, but the plaintiffs have failed to adequately allege sufficient facts to support their claims that the teachers breached that duty.

---

**156.** Michael Alonso in his deposition admitted to accepting and hiding the weapons and to taking target practice with Carneal.

**157.** This eyewitness account was given by Heath High School student Janalea Yarbrough in her deposition.